(No. 53840.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. PHILLIP E. LA POINTE, Appellee.

*Opinion filed November 13, 1981.—Modified on denial of rehearing January 29, 1982.*

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Thomas L. Knight and Robert L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mary Robinson and Mark Schuster, of the Office of the State Appellate Defender, of Elgin, for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Phillip E. La Pointe, entered an unnegotiated plea of guilty in the circuit court of Du Page County to the murder of Peter Moreno, Jr., and was subsequently sentenced to natural life imprisonment without parole. The appellate court reduced that sentence to 60 years' imprisonment. (85 Ill. App. 3d 215.) We granted the State's petition for leave to appeal, and now consider as the principal issue: Did the trial judge abuse his discretion in imposing the natural life sentence, for, unless he did, its reduction was error.

A number of witnesses testified at the 18-year-old defendant's August 31, 1978, sentencing hearing. David Cichelli testified that on March 7 he was employed at a service station in Elmhurst. On that morning the defendant, who was a friend of his, walked up to him at the gas pumps. Defendant told Cichelli that he was going to shoot a cab driver. They then went to the service station washroom where the defendant produced a gun and showed it to Cichelli. As the latter handled the gun and looked down the barrel, defendant told him it was loaded. Defendant then left the station but returned an hour or two later and told Cichelli that he "shot him in the head." Cichelli testified that at that time he believed defendant was kidding, but asked

why he shot the cab driver. Defendant said he did it for the money but that it was not worth it. Defendant also told Cichelli that he shot the cab driver because the driver saw defendant and knew who he was.

Sergeant James Altman of the Elmhurst police department testified that he participated in the investigation of the shooting death of Peter Moreno, Jr. When the sergeant arrived on the scene the victim was dead and lying on the floor in the front seat area of the cab. Decedent's head was near the passenger door and his legs were pulled up against, and partially under, the seat on the driver's side as if someone had driven the cab. His pockets had been turned inside out and there was no money or identification on him.

Sergeant Ralph O'Connell of the Elmhurst police department testified that he supervised the evidence work for this investigation and was present when decedent's body was examined by a pathologist. Decedent had been shot twice in the head and neck area from the rear and at close range.

Deputy Sheriff David Leeberg testified that he was assigned to the inmate recreation room of the Du Page County jail as a supervisor. He was acquainted with defendant and had occasion to observe him during his incarceration. In the latter part of March and early April the witness observed the defendant approximately 10 times wearing a tee shirt with the words "Elmhurst Executioner" written on it. The deputy also testified that he heard another inmate tell defendant that he was "crazy" for wearing a shirt with those words on it, and thereafter did not observe the defendant wearing that tee shirt.

Joseph Ray, a 16-year-old student, testified that he had been acquainted with the defendant for a year and a half. Two or three weeks before defendant was arrested, Ray met him at a store in Elmhurst, and defendant asked Ray to go to a drugstore restaurant with him to rob the cash register. Ray further testified that, prior to the drugstore con-

versation, he and defendant had once burglarized a home. The presentence report revealed that defendant was on probation for this burglary when the murder was committed. Ray also testified that defendant had telephoned him from the county jail and asked that he bring some "hash" to the defendant, but Ray refused.

Deputy Sheriff Robert Marx testified that he worked in the inmate recreation room and was acquainted with the defendant. He observed the defendant a week or two after arriving at the county jail wearing a tee shirt with the lettering "Elmhurst Executioner." The tee shirt was not produced after defendant gave permission for his belongings at the jail to be searched, but the officer testified it could have been flushed down the toilet or burned.

Deputy Sheriff Pat Cleveland testified that he worked at the county jail and observed the defendant in April of 1978, wearing the tee shirt that said "Elmhurst Executioner." Cleveland told defendant that he was "nuts" to be wearing that shirt, at which defendant "just laughed."

Patricia Duddles testified that she was 27, and, at the time of his death, she was living with and engaged to be married to Peter Moreno, Jr. She was 6½ months pregnant with his child at the time of the hearing. She further testified that, following Peter Moreno, Jr.'s death, she lost her home and that he had been her only means of support.

The defense witnesses testifying in mitigation of the offense included defendant's mother, Delores Malo, who stated that defendant had resided with her all his life. During the past three years she had noticed a change when he became involved with drugs, although she had never known him to be violent. She had sought counseling for him when he was 15 because he was a runaway. She stated that the relationship between the defendant and her husband, defendant's stepfather, had deteriorated because of her husband's drinking problem.

The stepfather, William Malo, testified that his rela-

tionship with the defendant was good until the defendant became involved with drugs, and thereafter defendant was "out of control" and "couldn't take any kind of responsibility," although the stepfather testified he had never seen him become physically aggressive with anyone.

The Reverend Erling Jacobson testified that he became acquainted with the defendant through defendant's mother, who asked him to help with the defendant's problem. Reverend Jacobson tried to work with the defendant, but felt defendant was dangerous to himself and to society and should be locked up. He realized the defendant had a drug problem and believed that he needed psychiatric care.

The defendant's father, Leroy La Pointe, testified that he lived in New Jersey and that the defendant visited him there the previous fall. Defendant stayed for about 4½ weeks. The father had never known defendant to be physically aggressive with anyone, but knew that he had a serious drug problem.

Defendant made the following unsworn statement to the court:

"At the time of this crime, no matter what Mr. Cichelli has said, I was under the influence of six hits of LSD. Normally, that is a lot for one person. Usually you can cut that in half and do it and still be really spaced out. To this day, I cannot remember if I have or have not killed Mr. Peter Moreno. If I did, I am truly sorry. I am not no killer by instinct. If I did, it was the LSD. But naturally, if I had known what I was doing, there was no way I could have killed that man. That is all I have to say, your Honor."

At the conclusion of the sentencing hearing the trial judge continued the cause to September 18 for the imposition of sentence.

Section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(1)) regarding sentencing provides in relevant part:

"[I]f the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present the court may sentence the defendant to a term of natural life imprisonment."

On September 18, prior to imposing sentence, the judge reviewed the transcript of the evidentiary hearing and commented on the mitigating and aggravating factors in sections 9—1 of the Criminal Code of 1961 and 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, pars. 9—1(b), 1005—5—3.1). He noted that defendant had attained the age of 18 at the time he committed the murder, had a significant history of prior criminal activity, and that an aggravating factor listed in section 9—1(b) was present in that the murder was committed in the course of another felony: the armed robbery of the victim. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6).) Contrary to the statement of the appellate court, reference was also made in the trial judge's comments to the presentence investigation. He indicated his belief that defendant had not been under the influence of extreme mental or emotional disturbance at the time of the murder, and concluded:

"So, the Court, in taking into consideration the heinous nature of this crime, its brutality, its cold, calculating, cold-blooded act which is indicative of the wanton cruelty, there was indication it was premeditated and postmeditated, the Court took into consideration the presentence investigation which more or less correlated everything that was in the transcript and the testimony on the hearing in aggravation and mitigation, and the Court has taken into consideration the arguments of counsel at the hearing in aggravation and mitigation, the fact that the defendant was over 18 years of age, and therefore, it shall be the judgment of this court that the defendant be remanded to the

custody of the Sheriff of Du Page County, and thence to the custody of the Illinois Department of Corrections, where he shall serve a life sentence, without parole."

Reviewing courts have the power under our Rule 615(b)(4) (73 Ill. 2d R. 615(b)(4)) to reduce sentences. The determination and imposition of a sentence is a matter involving considerable judicial discretion, and our recent cases have repeatedly emphasized that the standard of review to be applied in determining whether a sentence is excessive is: Did the trial judge abuse his discretion in imposing that sentence? *People v. Robinson* (1980), 83 Ill. 2d 424; *People v. Kuesis* (1980), 83 Ill. 2d 402; *People v. Cox* (1980), 82 Ill. 2d 268; *People v. Lykins* (1979), 77 Ill. 2d 35, 40; *People v. Perruquet* (1977), 68 Ill. 2d 149.

Fairness to the appellate court in this case requires us to note that its opinion preceded our decision in *Cox*, which reversed the appellate court in that case. The appellate court here had to some extent relied upon the appellate court holding in *Cox* that legislative action creating a "rebuttable presumption that the sentence imposed by the trial judge is proper" (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—4.1) had supplanted the abuse-of-discretion standard. (*People v. Cox* (1979), 77 Ill. App. 3d 59, *rev'd* (1980), 82 Ill. 2d 268; *People v. Choate* (1979), 71 Ill. App. 3d 267.) Except for this we assume the appellate court in this case would have applied the abuse-of-discretion criterion mandated by our earlier decisions and subsequently reaffirmed by this court in *Cox*.

The Unified Code of Corrections vests a wide discretion in sentencing judges in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. (*People v. Bolyard* (1975), 61 Ill. 2d 583.) We held in *Perruquet*, and emphasize here that "the trial court is normally the proper forum in which a suitable sentence is to be determined and the trial judge's

decisions in regard to sentencing are entitled to great deference and weight." 68 Ill. 2d 149, 154.

Defendant argues, however, that our constitution requires the trial court to make specific findings concerning the defendant's rehabilitative potential. The relevant section provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11.) The sentencing judge is always, as we stated in *Cox,* "charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender." (82 Ill. 2d 268, 280.) That task can be an agonizing one to the solution of which a trial judge may well devote substantial amounts of time and thought. But the quoted constitutional provision does not require the judge to detail for the record the process by which he concluded that the penalty he imposed was appropriate. As we have noted, the record indicates that the trial court in this case, as in *Cox,* carefully considered the evidence within the prescribed statutory framework, including the statutory factors in mitigation and aggravation, the presentence investigation, the credibility and demeanor of the witnesses, the defendant's premeditation and deliberation, and the total absence of remorse on his part. We note, too, the judge's specific rejection of mitigating factors which might otherwise have indicated a potential for rehabilitation:

"(8) the defendant's criminal conduct was the result of circumstances unlikely to recur;

(9) the character and attitude of the defendant indicate that he is unlikely to commit another crime." (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.1(a)(8), (9).)

In our judgment the record indicates a thorough consideration of the factors constitutionally and statutorily designated for the trial judge's attention.

The defendant also argues, and the appellate court held, that the trial court erred in finding that defendant was not under extreme mental or emotional disturbance at the time of the murder, and that defendant had a significant history of prior criminal activity. We do not agree. While the testimony indicated a substantial history of illicit drug use by defendant, and he said he had been under the influence of LSD at the time of the killing, the presentence report contained statements by David Cichelli that defendant did not appear to be under the influence of drugs either shortly before or shortly after he killed the cab driver, and Cichelli testified defendant "looked normal." In these circumstances the trial judge's findings as to his mental or emotional state are not against the manifest weight of the evidence. Nor do we believe the trial judge erred in finding a significant history of prior criminal activity. Although defendant was only 18 at the time he shot the victim, he was then on probation as the result of an earlier conviction for burglary. He had apparently engaged for two or three years in the illegal possession and use of drugs. Those circumstances alone seem to us sufficient to justify the trial court's finding, even without the additional testimony of Joseph Ray that defendant had solicited him to participate in a robbery with defendant, and, after defendant's incarceration, had requested Ray to smuggle some "hash" to him. The appellate court held admission of this evidence to be error since no prosecution or conviction had resulted from that conduct. Our decisions, however, do not support that holding. In *People v. Adkins* (1968), 41 Ill. 2d 297, 300-01, this court noted:

"In Illinois, too, we have long held that the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the adversary circumstances of a trial. While it must exercise care to insure the accuracy of information considered and to shield

itself from what might be the prejudicial effect of improper materials (*People v. Crews*, 38 Ill. 2d 331), 'the court is not confined to the evidence showing guilt, for that issue has been settled by the plea. The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry. It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People v. Popescue*, [345 Ill. 142], the judge should know something of the life, family, occupation and record of the person about to be sentenced.' *People v. McWilliams*, 348 Ill. 333 at 336. See also *People v. Popescue*, 345 Ill. 142; *People v. Mann*, 27 Ill. 2d 135; Ill. Rev. Stat. 1967, chap. 38, par. 1—7(g)."

In *People v. Kelley* (1970), 44 Ill. 2d 315, 318, *Adkins* was cited with approval as authority for the admission at a sentencing hearing of testimony as to misconduct which had not resulted in prosecution and conviction. (See also *People v. Meeks* (1980), 81 Ill. 2d 524, 535; *People v. Poll* (1980), 81 Ill. 2d 286, 290.) The various panels of the appellate court have not been entirely harmonious in their treatment of the subject (compare *People v. Fritz* (1979), 77 Ill. App. 3d 1, with *People v. Kennedy* (1978), 66 Ill. App. 3d 35), and the State urges that we clarify the extent to which evidence of criminal conduct may be introduced at sentencing hearings even though that misconduct has not been the subject of prosecution and conviction. We believe, however, that adequate guidelines are to be found in the provisions of chapter V of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, pars. 1005—1—1 through

1005—9—3) and our earlier opinions. *Adkins* is particularly informative in emphasizing that "a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." (41 Ill. 2d 297, 300.) While "the judge *** is not limited to considering only information which would be admissible under the adversary circumstances of a trial," he must "exercise care to insure the accuracy of information considered." 41 Ill. 2d 297, 300.

Similarly broad standards have been announced in other jurisdictions. (See Annot., 96 A.L.R.2d 768, §7(a), at 787-91; §10(c), at 798-99 (1964), discussing cases in which courts have approved consideration by sentencing judges of criminal misconduct established by the testimony of witnesses, and A.L.R. Later Case Service listing later cases with similar holdings.) In implementing the concept that punishment should fit the offender and not merely the crime, the Supreme Court has repeatedly affirmed the "fundamental sentencing principle' " that " ' "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." ' " (*Roberts v. United States* (1980), 445 U.S. 552, 556, 63 L. Ed. 2d 622, 628, 100 S. Ct. 1358, 1362; *Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083.) In *Williams* the Supreme Court elaborated upon reasons for differentiating between the rules of evidence governing trial and sentencing procedures.

"In addition to the historical basis for different evidentiary rules governing trial and sentencing procedures there are sound practical reasons for the distinction. In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. Rules of evidence have been fashioned for

criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

\* \* \*

\* \* \* We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.
\* \* \*

The considerations we have set out admonish us against treating the due-process clause as a uniform command that courts throughout the Nation abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence. New York criminal statutes set wide limits for maximum and minimum sentences. Under New York statutes a state judge cannot escape his grave responsibility of fixing sentence. In determining whether a defendant shall

receive a one-year minimum or a twenty-year maximum sentence, we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts—state and federal—from making progressive efforts to improve the administration of criminal justice." *Williams v. New York* (1949), 337 U.S. 241, 246-51, 93 L. Ed. 1337, 1342-44, 69 S. Ct. 1079, 1083-85.

It is apparent from the Supreme Court holdings that the due process clause of the Federal Constitution offers no impediment to the consideration of the evidence with which we are here concerned. Nor, apparently, would that clause prohibit the consideration of information unattended by the safeguards present here unless its accuracy was denied. We see no purpose to be served by interpreting our own constitutional provisions more restrictively. Whether a defendant had been prosecuted and convicted for other misconduct, proof of which is offered at a sentencing hearing, is not, in our judgment, controlling as to its admissibility. More important are the questions of relevancy and accuracy of the information submitted. Those questions are, of course, initially determined by the trial judge in the exercise of an informed discretion. Where, as here, that information indicates defendant solicited another to commit criminal offenses, and comes in the form of sworn testimony by the party solicited, presented in open court and subject to cross-examination, its admission by the trial judge is not an abuse of discretion. The conduct testified to was relevant to a determination of a proper sentence in that it bore upon the likelihood or unlikelihood that defendant would commit other offenses; it appeared trustworthy; defendant had the opportunity to face and

cross-examine the witness; and the accuracy of the information was not challenged. While trial judges should be cautious in admitting such proof and sensitive to the possibilities of prejudice to defendant if inaccurate information is considered, we believe that a trial judge may, under circumstances such as those here, properly receive proof of criminal conduct for which no prosecution and conviction ensued.

Defendant also challenges the constitutionality of section 5—8—1(a)(1) (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(1)), authorizing natural life imprisonment. First, defendant contends that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" is unconstitutionally vague and therefore violates the due process requirements and, second, that the felony sentencing scheme which offers the prospect of release to every offender sentenced to a term of imprisonment excepting a small class of murder defendants violates equal protection of the law.

We note at the outset that a statute enjoys a strong presumption of constitutionality (*People v. Schwartz* (1976), 64 Ill. 2d 275, 281), and the burden of showing invalidity is on the party challenging the enactment (*People v. McCabe* (1971), 49 Ill. 2d 338, 340). A statute is unconstitutionally vague if its terms are so ill defined that their meaning will ultimately be determined by the opinions and whims of the trier of fact rather than any objective criteria. (*People v. Pembrock* (1976), 62 Ill. 2d 317, 322.) A court will assume, however, that absent a contrary legislative intent the words used in a statute have their ordinary and popularly understood meanings. (*People v. Schwartz* (1976), 64 Ill. 2d 275, 280; *Farrand Coal Co. v. Halpin* (1957), 10 Ill. 2d 507, 510.) In addition to the language used, consideration is also given to the legislative objective and the evil the statute is designed to remedy. (*People v. Dednam* (1973), 55 Ill. 2d

565, 568.) The descriptive adjectives employed in section 5—8—1(a)(1) are commonly used words which, clearly, are not so vague and indefinite as to be constitutionally void. Coupled with the objectives sought to be achieved and the evil the statute seeks to remedy they give sufficient direction to trial judges who must determine when and whether to impose the natural life sentence of imprisonment. We accordingly conclude that the statute is not vulnerable to attack on due process grounds. Nor does it deny defendant equal protection of the law.

The equal protection clause does not deny the State the power to treat different classes of persons in different ways. (*People v. Bradley* (1980), 79 Ill. 2d 410, 416, citing *Eisenstadt v. Baird* (1972), 405 U.S. 438, 446-47, 31 L. Ed. 2d 349, 358, 92 S. Ct. 1029, 1034-35; *Skinner v. Oklahoma* (1942), 316 U.S. 535, 540, 86 L. Ed. 1655, 1659, 62 S. Ct. 1110, 1113.) "That clause requires equality between groups of persons 'similarly situated'; it does not require equality or proportionality of penalties for dissimilar conduct." (*People v. Bradley* (1980), 79 Ill. 2d 410, 416, citing *McGowan v. Maryland* (1961), 366 U.S. 420, 427, 6 L. Ed. 2d 393, 400, 81 S. Ct. 1101, 1105-06; *People v. Nicholson* (1948), 401 Ill. 546, 553.) That the legislature, under the State's police power, has wide discretion to classify offenses and prescribe penalties for the defined offenses is well established. (*People v. McCabe* (1971), 49 Ill. 2d 338, 340-41; *People v. Dixon* (1948), 400 Ill. 449, 453.) Thus, the equal protection challenge in this context is limited: if any state of facts may reasonably be conceived to justify the enactment, it must be upheld. (*People v. McCabe* (1971), 49 Ill. 2d 338, 341.) The legislative determination to differentiate in sentencing between certain classes of murderers is not irrational. Although society is outraged by all murders, consideration must be taken to insure that the punishment is appropriate and just depending upon the circumstances. (*People v.*

*Crews* (1967), 38 Ill. 2d 331, 337.) A sentence of natural life imprisonment for the class of murderers who have demonstrated by their conduct their capacity for particularly brutal and heinous crimes indicative of wanton cruelty appears to us reasonably designed to remedy the evil and a legitimate means by which the legislature might seek to protect society. See *People v. Smith* (1980), 91 Ill. App. 3d 438, 454.

Defendant urges, too, that the statutory language permitting the imposition of a natural life imprisonment sentence where conduct is "accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty" (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)(b)) authorizes that sentence only if he had inflicted "torture or unnecessary pain upon his victim." We do not agree. "Heinous" is defined by Webster's Third New International Dictionary (unabridged) as "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal"; "brutal" includes "grossly ruthless," "devoid of mercy or compassion: cruel and cold-blooded." Clearly, in our opinion, the statute does not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain.

The record in this case indicates that the defendant, a young man with a significant history of criminal activity, acted with premeditated, cold-blooded deliberation in deciding to kill a cab driver, a homicide for which the death penalty could have been sought, had the prosecutor elected to do so. Following that murder and while being held in the county jail, he displayed a callous attitude and complete lack of remorse by wearing the tee shirt with the words "Elmhurst Executioner" appearing thereon. We do not believe that the trial judge can be said to have abused his discretion in sentencing defendant to natural life imprisonment without parole.

502

The judgment of the appellate court is accordingly reversed, and the judgment of the circuit court of Du Page County is affirmed.

*Appellate court reversed: circuit court affirmed.*