(No. 53175.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES DEVIN, Appellant.

*Opinion filed October 22, 1982.—Rehearing denied January 28, 1983.*

328

UNDERWOOD, J., and RYAN, C.J., concurring in part and dissenting in part.

George P. Lynch and Joseph M. Macellaio, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Herbert Lee Caplan, Melbourne A. Noel, Jr., Thomas E. Holum, and Michael B. Weinstein, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

In a jury trial in the circuit court of Du Page County defendant, James Devin, was convicted of the murder of Scott Brunoehler, a fellow inmate in the Du Page County jail. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) the People requested a sentencing hearing. The jury found that there were present one or more of the aggravating factors set forth in section 9—1(b). Following the consideration of aggravating and mitigating factors the jury found that there were no mitigating factors sufficient to preclude a sentence of death (see Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) and returned a verdict directing the

court to sentence defendant to death. Defendant was sentenced, and the sentence was stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603).

The testimony of several of the inmates of the tier in which defendant and the deceased were being held shows that defendant had suggested that there be a "blanket party" for Brunoehler. A blanket party was defined as a form of harassment in which a blanket is thrown over the victim and the victim is then punched and kicked through the blanket. On the day on which the blanket party occurred, one of the inmates had ripped a bed sheet into three strands and another inmate, Robert Gangestad, had started braiding the strands into a rope. Defendant, apparently dissatisfied with the way in which the strands were being braided, took over and braided the rope himself. That night defendant, accompanied by Billy Hopson and Robert Gangestad, went to Brunoehler's bed. While Gangestad held Brunoehler's arms and Hopson held his feet, defendant put the rope around Brunoehler's neck and the remainder underneath his knee, and then fell on the rope. After Brunoehler's body went limp, he was dragged to the dayroom and suspended from a lamp. Several inmates testified that they had seen various portions of this sequence of events or had heard gurgling noises which sounded like someone unable to breathe.

A jail guard testified that he saw Brunoehler's body hanging in the dayroom. He climbed up the bars and cut the body down. The jail medical officer testified that he saw two rope burns on the right side of Brunoehler's neck, one seemed to parallel the ground and the other slanted up toward the top of the neck.

An inmate testified that after Brunoehler's death he was confined in the same tier as defendant. Defendant described the incident, and said that the victim's eyes

popping out, his face puffing up, and his urinating while choking to death were "really dynamite." Defendant told him that he killed Brunoehler hoping that at first the authorities would think it was a suicide. Later, defendant planned to implicate two other inmates in the tier, who were notorious in Du Page County, and who defendant believed the State really wanted to have imprisoned for a long time. For his coming forward, defendant believed he would receive more lenient sentences for the armed robbery charges for which he was being held. Defendant explained that if the plan backfired he would probably be found guilty of voluntary manslaughter. The State would probably accept a plea bargain in order to avoid a jury trial. The witness admitted on cross-examination that he was defendant's partner in a series of armed robberies of chain restaurants and that at the time of his arrest defendant had told the police that the witness was his accomplice. He stated that he received nothing from the State in consideration of his testimony.

The jury found defendant guilty of murder. At the second phase of the trial, the jury found at the time of the offense defendant was over 18 years of age and that he had murdered a fellow jail inmate. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(2).) At the third phase, the jury considered evidence in aggravation and mitigation and found no mitigating factors that would preclude the imposition of the death penalty.

Defendant's first claim of error concerns the jury's viewing of the portion of the jail where the offense was allegedly committed. At the conclusion of opening statements, the circuit court, defense counsel, defendant, and the State's Attorney retired to the judge's chambers to discuss the procedures to be followed in conducting the "view" to which defense counsel and the State's Attorney had stipulated. The court and counsel discussed the path that the jury would take through the jail and what

would be pointed out to them. After counsel had agreed to the procedure, the court asked if defendant was going to go with them. Defense counsel replied, "He will stay here but I am going." The court asked if anyone wanted the court to go along, and the following colloquy ensued:

"MR. ANDERSON [assistant State's Attorney]: No.

MR. EMERY [assistant State's Attorney]: No.

MR. ANDERSON: Do you want the judge to go?

MR. HEIDECKE [defense counsel]: Are you going?

THE COURT: There is no reason I have to go, is there?

MR. HEIDECKE: Not that I know of.

MR. EMERY: We are not ordering the court to go."

Defense counsel made no mention of any unusual or objectionable occurrence during the view, and no mention of the view was made in defendant's post-trial motion.

Defendant contends that his constitutional rights to due process of law and confrontation were violated because the court ordered a view of the scene of the crime and did not attend the view; that when the jury viewed the premises defendant was not present and had not personally waived his right to be present; that a court reporter was not in attendance at the time; and that the jury was placed under the control of a deputy sheriff who was not appropriately sworn to protect the jury. The People contend any error resulting from the failure of the defendant and the circuit court to be present at the viewing of the jail premises was waived. On this record we could hold that the alleged error was waived, but in view of defendant's contention that he was denied a substantial constitutional right, we elect to review it.

Because his absence might affect the fairness of the proceedings an accused has the right to be present at all stages of the trial. (*Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525.) At common law a viewing of the premises was not considered a part of the trial. (*Snyder v. Massachusetts* (1934), 291 U.S. 97, 107, 78

L. Ed. 674, 679, 54 S. Ct. 330, 335.) Our review of the authorities shows that only in those jurisdictions where a statute specifically requires the court's presence during a viewing has its failure to be present been held to be error. (Compare *State v. Rohrich* (N.D. 1965), 135 N.W.2d 175, 180, and *McCollum v. State* (Fla. 1954), 74 So. 2d 74, 76-78 (*en banc*), with *State v. Suber* (1911), 89 S.C. 100, 101-02, 71 S.E. 466, 467, and *State v. McClurg* (1931), 50 Idaho 762, 792-95, 300 P. 898, 909-11; see also Annot., 47 A.L.R.2d 1227, 1228-29 (1956).) The record shows that the circuit court gave carefully detailed instructions concerning the manner in which the viewing was to be conducted and that defense counsel stated he would be present. Under the circumstances we find that no error resulted from the failure of either the court or the defendant to be present when the jury viewed the premises.

We have considered defendant's arguments that comments made by the State's Attorney during closing argument indicate that during the viewing there must have been considerable colloquy and discussion between the jury and the officer who was showing them the premises. Clearly the State's Attorney's comments were based on evidence adduced at the trial, and defendant's contention concerning the comments and colloquy is based on pure conjecture.

Citing *Beck v. Alabama* (1980), 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382, defendant contends that the circuit court erred in refusing to give two instructions on voluntary manslaughter submitted by defendant. In *Beck* the defendant was convicted of murder committed during the course of a robbery and sentenced to death. On review the Alabama Supreme Court affirmed. The Supreme Court reversed on the ground that the sentence of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital of-

fense when the evidence would have supported such a verdict. *Beck* is clearly distinguishable for the reason that the record shows that in this case the evidence would not have supported a verdict of manslaughter.

Defendant contends next that the circuit court erroneously refused to give an instruction on involuntary manslaughter. Defendant argues that there was "substantial" evidence supporting an involuntary-manslaughter instruction. Specifically, defendant states that uncontradicted testimony established that blanket parties did not ordinarily involve inflicting serious injury to the victim, and that "they" were not going to hurt Scott Brunoehler. The record shows that Hopson and Gangestad testified that they were surprised when defendant placed the rope around Brunoehler's neck and "kneedropped" on the rope. In contrast, several witnesses testified that defendant admitted his intent to murder Brunoehler. There was no evidence to support the tendered instruction on involuntary manslaughter, and refusing to give it was not error.

Defendant contends that his constitutional rights to due process and effective assistance of counsel were denied him in that "agents" of the State's Attorney's office surreptitiously overheard conversations between defendant and his trial counsel and because the People purposely "placed" potential witnesses near defendant in order to obtain a confession from him. Defendant also suggests that the State attempted to prevent defendant from acquiring counsel after his indictment. We find nothing in the record to support these arguments, and we decline to consider them.

Defendant contends that his constitutional rights to representation by counsel and due process were violated by reason of ineffective assistance of counsel afforded him at trial by his court-appointed lawyer. He concedes that the record shows adequate preparation by trial counsel but argues that in a case where the death penalty could be imposed no lawyer should be appointed who has not tried at

least 100 felony cases and 10 murder cases. We are in complete agreement that it is desirable to provide representation by experienced counsel, but we do not agree that defendant did not receive effective assistance of his trial counsel. The record shows thorough preparation, filing of numerous motions, making of many objections, many of which were sustained, and a thoroughly professional representation of defendant's rights.

Defendant contends next that in permitting the introduction of evidence of other crimes the circuit court committed reversible error. An inmate testified that, while he and defendant were in jail, defendant admitted to murdering the victim and that defendant had told him that he wanted it to look like the victim committed suicide. Later, defendant planned to inform the authorities that the victim was murdered by two other inmates in the tier who were notorious in the county, whom defendant believed the People would be eager to prosecute for murder. As a reward for his information, defendant believed, the People would reduce his sentence for the charges pending against him. The witness asked him what he would do since the plan had obviously backfired. Defendant replied that this possibility had been contemplated and that if the plan backfired he would get the State to accept his guilty plea for voluntary manslaughter since the State would be unwilling to present such a weak case. If the State refused, defendant would threaten to request a jury trial. After an objection based on the narrative form of the testimony, the witness reiterated the defendant's admission, but this time specifically mentioned that the pending charge was for armed robbery. Defense counsel objected and moved for a mistrial because of the reference to pending charges. The People argued that the reference to pending charges was necessary to the witness' testimony. The State's Attorney told the court that he had told the witness to refer to the armed-robbery charges as "pending charges," and offered

to remove the witness from the stand and again admonish him to refer to the armed-robbery charges as "pending charges." The court agreed to send the jury to the jury room and admonish the witness accordingly, but defense counsel stated that he would have to "go into it now." Trial resumed and the court did not admonish the witness. On cross-examination, defense counsel attacked the witness' credibility on the ground that he was angry at defendant because defendant had given the police the witness' name when defendant was apprehended for the armed robberies that he and the witness had committed together.

We find no error in the admission of the testimony concerning the armed robberies. Defense counsel's statements during the discussion in the judge's chambers indicate that he was objecting "to any mention of the pending charge ***." The testimony was admissible in order to show defendant's motive. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, citing *People v. McDonald* (1975), 62 Ill. 2d 448.) While we agree that reference to "pending charges" is preferable to the specific reference to armed robbery, the objection was to any reference to other crimes no matter what the form. The reference to armed robbery, rather than "pending charges," was not so prejudicial as to require reversal.

Defendant also alleges that the circuit court's instruction to the jury to limit their use of evidence of other crimes to proper purposes "merely highlighted the improper admission of unrelated criminal occurrences ***." In light of our conclusion that the reference to armed robbery was not so prejudicial as to require reversal, we fail to see in what manner prejudice resulted from the giving of the instruction.

Defendant contends that the circuit court erred in permitting the State's Attorney to make comments in closing argument which penalized defendant for exercising his

right to counsel. He argues that the error is of constitutional proportions. The record shows that another inmate in the jail testified concerning the occurrence which resulted in Brunoehler's death. He refused to talk to the officers who sought to interrogate him until he had spoken with a lawyer. In closing argument, defense counsel stated:

"[This inmate] said, I wanted to see my lawyer. Mr. Anderson suggests, well, he wants to go to his lawyer to—I don't know what he suggests. I know why he went to see his lawyer. I know why people come to me as a criminal lawyer before they are ever charged because they are afraid. They have something to hide. They need a lawyer, and I think the reason they needed a lawyer is because they thought they were in trouble.

They had goaded and kidded and caused Scott Brunoehler to hang himself.

They were participants. They were afraid and they thought they were criminally culpable, and they wanted to see a lawyer. Am I in trouble?

\* \* \*

If they really saw what they say they saw, they would have said so, not wait three or four days later. They didn't have to go see their lawyers."

In closing argument, the State's Attorney responded:

"Mr. Heidecke [defense counsel] says, well, I'm a lawyer, I know. Why do they want to talk to a lawyer? Because they are guilty of something. \*\*\*

\*\*\*

\*\*\* Is every single person who consults a lawyer guilty of something? That appears to be the inference from what Mr. Heidecke is saying and I say to you, Mr. Heidecke is here. Mr. Heidecke is a lawyer. He is appearing in this case. He has been consulted by someone."

In our opinion the comments of defense counsel invited the complained-of statement. (*People v. Vriner* (1978), 74 Ill. 2d 329, 344; *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) Defendant argues that the instant case is distinguishable because defendant did not take the stand and therefore the prosecution's remarks, even if in-

vited, violated defendant's fifth and sixth amendment rights. We fail to see how the quoted statements relate to defendant's fifth amendment right to remain silent. The fact that the invited comment relates to the right to be represented by counsel does not preclude the People from responding.

Defendant contends next that his right to a fair trial was violated because the People suggested to the jury that they find defendant guilty because his codefendant, Billy Hopson, had pleaded guilty. Throughout the trial defense counsel argued that Scott Brunoehler committed suicide because his fellow inmates had encouraged him to do so, and that the witnesses were testifying against defendant because, among other reasons, he was considered a "snitch." In closing argument defense counsel argued that Billy Hopson knew that he could get the death sentence if he was found guilty of murdering Brunoehler; that even though Brunoehler's death was a suicide, Hopson, because he did not want to gamble with a death penalty, agreed to a 20-year sentence in exchange for testifying against defendant. The People argued that defendant's suicide theory was implausible because no man would admit to a murder that never occurred and spend even two years extra in prison, let alone 20. No objection was made to this argument.

The prosecution may not directly or indirectly suggest that the jury should find a defendant guilty because a codefendant has pleaded guilty. (*People v. Sullivan* (1978), 72 Ill. 2d 36, 41-42.) This, however, is not what occurred here. The State's Attorney argued that defendant's contention that no crime had occurred at all because the victim committed suicide was implausible because another individual would not have pleaded guilty to a crime that never occurred. We do not interpret this to suggest that defendant was guilty because Hopson pleaded guilty; rather, it suggests that defendant was guilty because his theory of the

facts was unbelievable. Additionally, unlike *Sullivan*, the prosecutor did not bring out for the first time in closing argument the fact that a codefendant had pleaded guilty, but did so in refuting defense counsel's theory of why the defendant's codefendant pleaded guilty.

Upon review of the foregoing contentions of error we conclude that the record reflects no error which requires reversal of the conviction and the judgment insofar as defendant is convicted of the offense of murder is affirmed.

We consider now defendant's contentions concerning the sentencing hearing. Defendant contends first that the aggravating circumstance which the jury found to be present does not fall within the ambit of section 9—1(b)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(2)). Insofar as pertinent here section 9—1(b)(2) provides:

"(b) *** A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:
***

2. the murdered individual was an employee of an institution or facility of the Department of Corrections, or any similar local correctional agency, killed in the course of performing his official duties, or the murdered individual was an inmate at such institution or facility and was killed on the grounds thereof, or the murdered individual was otherwise present in such institution or facility with the knowledge and approval of the chief administrative officer thereof." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(2).)

Defendant contends that the Du Page County jail is not an institution or facility to which this foregoing provision is applicable.

Defendant contends further that section 9—1(b)(2) of the Criminal Code of 1961 is unconstitutional because it is vague and indefinite. He refers to the statutory language

and points out that the deceased was an inmate of the Du Page County jail and not of an institution or facility of the Department of Corrections. He argues that the indictment was "at total variance" with the statute. He argues further that the statute makes no reference to murders of inmates at county jails and that had the General Assembly intended that the statute apply under those circumstances it could very easily have so provided.

Sections 3—1—2(c) and (d) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, pars. 1003—1—2(c),(d)) provide that "correctional institution" means "any building or part of a building where committed persons are kept in a secured manner." Section 2—14 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 2—14) provides that "penal institution" means a "penitentiary, state farm, reformatory, prison, jail, house of correction, or other institution for the incarceration or custody of persons under sentence for offenses or awaiting trial or sentence for offenses."

Section 5—7—3 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—7—3(b)) permits commitment under a sentence of periodic imprisonment for a felony, *inter alia,* to the sheriff, in which event a prisoner would be confined in the county jail. "A cardinal rule of statutory construction ordains that sections *in pari materia* should be considered with reference to one another so that both sections may be given harmonious effect." (*People v. Scheib* (1979), 76 Ill. 2d 244, 250.) It is presumed that in enacting the statutes under consideration the General Assembly was aware that commitments of convicted felons would be made to the sheriff and that under those circumstances the prisoner would be an inmate of a "similar local correctional agency." (*People v. Manning* (1979), 76 Ill. 2d 235, 241.) We hold, therefore, that the circuit court did not err in its ruling that section 9—1(b)(2) was applicable as an aggravating factor which could invoke the

death penalty proceedings.

Defendant argues that the introduction of testimony during the sentencing hearing (phase III) to the effect that there is no known treatment for persons with antisocial or sociopathic personalities permitted the jury to sentence defendant to death because he has an incurable disease. We disagree.

Three psychiatrists testified at the hearing. Dr. James L. Cavanaugh, Jr., a psychiatrist called by the People, testified that he diagnosed defendant as a sociopath, able to conform his conduct to the law but unwilling to do so. He did not agree with the diagnosis of schizoid personality contained in defendant's military service record. He concluded that defendant was a sociopathic personality but found no dysfunction that impaired his ability to comprehend reality or distinguish right from wrong. Dr. Cavanaugh testified that there was no known treatment for individuals with sociopathic personalities other than biological treatments "outlawed by modern society." When asked whether one's upbringing or environment could cause schizophrenia, Dr. Cavanaugh explained that an individual must have the underlying biochemical problem associated with schizophrenia in order to become schizophrenic. Dr. Cavanaugh stated that defendant showed no indications of a psychotic or schizophrenic personality.

Dr. Lyle Rossiter, Jr., called by defendant, agreed that defendant was a sociopathic personality. He explained that the conscience's function is to provide internal restraints and prohibitions against certain immoral, unethical, or antisocial behavior. On cross-examination, Dr. Rossiter stated that sociopaths are able to conform their conduct to "right," but on occasion choose not to do so. Further, the individual with an antisocial personality often chooses to engage in criminal activity, and the "recidivist" criminal is often said to have a sociopathic element in his personality. Dr. Rossiter agreed that this type of personality is preva-

lent in the penal system. He admitted that, statistically, sociopaths would be more likely to commit murder than other segments of the population, but it was impossible to predict which sociopath might commit murder. He also stated that the antisocial personality that had already committed murder would be more likely to commit murder again. Dr. Kiran Frey, called by defendant, diagnosed defendant as a borderline schizophrenic, and testified that while defendant appreciated right from wrong and could conform to right, he had an impairment in his ability to conform to societal standards.

The State's Attorney, in closing argument, stated that this information was relevant because it showed that defendant was likely to commit murder again, and that imposition of the death penalty was the only way to protect the Scott Brunoehlers of the world. In response to defense counsel's characterization of the defendant as a sick person who should be removed from society but not executed because of his problem, the State's Attorney argued that the personality disorder of sociopathy was nothing more than the personality known as the criminal mind, and that if defendant was capable of distinguishing right from wrong and conforming his behavior accordingly, but merely chose not to conform, he should be held fully accountable for his actions.

We do not agree that admitting this testimony permitted the jury to sentence defendant to death because he had an incurable disease. Dr. Cavanaugh explained that by the term "disorder" psychiatrists roughly meant to indicate any deviation from the expected order of things, and that any crime would indicate some type of disturbance or disorder. In this sense of the word, a person cannot escape punishment merely because he has a disorder. Carried to its extreme, defendant's argument would suggest that no person committing a crime should be punished for that crime because he had a disorder as shown by the fact that

he committed a crime.

The evidence is relevant to the related questions whether it is likely that the defendant's crime will be repeated and whether he is likely to be rehabilitated. The psychiatric testimony, together with evidence of defendant's inability to be content with leading a "straight" life and his long history of criminal activity, was relevant evidence concerning his character.

Defendant contends that his rights to a jury trial and due process were violated when the circuit court refused to impanel a new jury during the sentencing phases of the trial. Defense counsel at trial argued that he had lost his credibility with the jury because the suicide defense was so implausible, and requested a new jury be impaneled for the sentencing phases. The statute presumes that the sentencing hearing will be conducted before the jury that determined guilt unless that jury, "for good cause shown," was discharged. The record reflects no basis to hold that the jury was unable to proceed fairly with the sentencing phases of the trial. We are unable to say that the circuit court erred in refusing to impanel a new jury.

In a motion to amend his brief, defendant contends that his rights under the fifth and sixth amendments were violated when Dr. Cavanaugh was permitted to testify concerning statements made by defendant during his examination. He contends that he was not specifically informed that any statements made during the fitness examination could be used against him at the sentencing stage of the trial. (See *Estelle v. Smith* (1981), 447 U.S. 934, 65 L. Ed. 2d 1129, 101 S. Ct. 1866.) No objection was raised at trial concerning Dr. Cavanaugh's testimony, and thus the issue is waived on appeal. (*People v. Gaines* (1981), 88 Ill. 2d 342; *People v. Lewis* (1981), 88 Ill. 2d 129; *People v. Carlson* (1980), 79 Ill. 2d 564.) We note parenthetically that the record shows that Dr. Cavanaugh testified that prior to commencing the examination he told defendant that he

could, and expected to, testify as to what defendant told him.

Defendant contends that his rights to due process were violated by reason of the fact that his codefendants were given penitentiary sentences. The record shows that Billy Hopson, also indicted for the murder of Brunoehler, at the time of the offense was serving a sentence of 90 days imposed for violation of probation for a misdemeanor theft conviction. He pleaded guilty to murder and was sentenced to 20 years in the penitentiary.

Robert Gangestad was serving 75 days in the Du Page County jail as a condition of probation on an aggravated-battery conviction. He was tried for murder, convicted and sentenced to 40 years in the penitentiary. There is little similarity between the prior criminal records of defendant and his codefendants. Furthermore, defendant's role in the murder of Brunoehler was considerably different than theirs. The disparity in sentences did not cause a violation of due process.

Although we have found no error which requires reversal of the conviction for murder and do not agree that the alleged errors in the sentencing phase of the case heretofore discussed require reversal or remand, we nevertheless conclude that because the jury was permitted to consider certain information without adequate limiting instructions the sentence of death must be vacated and the cause remanded to the circuit court for resentencing.

The purpose of the aggravation and mitigation phase of the sentencing hearing is to insure that discretion in the area of sentencing be exercised in an informed manner. In *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, the Supreme Court said:

> "This Court has previously recognized that '[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the

character and propensities of the offender.' *Pennsylvania ex rel. Sullivan v. Ashe* [(1937), 302 U.S. 51, 55, 82 L. Ed. 43, 46, 58 S. Ct. 59, 61]. Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York* [(1949), 337 U.S. 241, 247-49, 93 L. Ed. 1337, 1342-43, 69 S. Ct. 1079, 1083-84]; *Furman v. Georgia* [(1972), 408 U.S. 238, 402-03, 33 L. Ed. 2d 346, 443-44, 92 S. Ct. 2726, 2810-11] (Burger, C.J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles* [(1958), 356 U.S. 86, 100, 2 L. Ed. 2d 630, 642, 78 S. Ct. 590, 597] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.

It has long been the law in this jurisdiction that a sentencing court, vested with discretion as to the extent of punishment, must hear evidence in aggravation and mitigation. (See Ill. Rev. Stat. 1845, ch. XXX, par. 183.) This court, repeatedly, has emphasized the importance of excluding from consideration matters which might erroneously prejudice the sentencing authority. In *People v. Riley* (1941), 376 Ill. 364, the defendants had pleaded guilty to murder and were sentenced to death. In discussing evidence heard by the circuit court in aggravation and mitigation the court said:

"On a hearing of this kind the prosecutor is under both a legal and moral duty not to offer anything for the consideration of the trial judge which may be of doubtful competency and materiality. On this kind of a hearing the attorneys must be held accountable for the highest ethical standards and if it can be seen that a breach of such

standards has prejudiced a defendant it must be expected that any sentence so attained will be set aside." 376 Ill. 364, 367-68.

"Obviously the trial judge owes the same duty to the defendant to protect his own mind from the possible prejudicial effect of incompetent evidence that he would owe in protecting a jury from the same contaminating influence. The prosecutor in such circumstances owes the duty of not only protecting the defendant but also the judge from such prejudicial matter." 376 Ill. 364, 369.

In *People v. Crews* (1967), 38 Ill. 2d 331, 337, the court said:

"Plainly, a judge with the solemn responsibility of determining the punishment of the convicted is to be encouraged to hear and consider all available and pertinent information concerning the person and the crime, so as to enable him to impose a punishment which is appropriate. However, before relying on such information the judge must determine its accuracy (see *People v. O'Neil,* 18 Ill. 2d 461, 466; *People v. Serrielle,* 354 Ill. 182), and he must take care to shield his mind from what might be the prejudicial effect of unreliable and other improper evidence. (See *People v. Riley,* 376 Ill. 364, 369.)"

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 496, we quoted with approval from *People v. Adkins* (1968), 41 Ill. 2d 297:

" '[A] sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.' (41 Ill. 2d 297, 300.) While 'the judge *** is not limited to considering only information which would be admissible under the adversary circumstances of a trial,' he must 'exercise care to insure the accuracy of information considered.' 41 Ill. 2d 297, 300."

Under the provisions of section 9—1(e) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e)) a jury hears and may consider information regardless of its admissibility under the rules governing the admission of evidence at criminal trials. Cer-

tainly the precautions taken to preclude the "contaminating influence" of improper information should be at least as great as those required by the foregoing authorities when the hearing is before the court. The testimony shows that a number of witnesses were permitted to testify concerning conversations with defendant. Defendant's former wife testified that she had discussed with defendant the term "hit man" and that he had said that if he wanted anything done he could have it done and told her about the various nerves "that could hurt you real bad." A third inmate, who was incarcerated with defendant in the Du Page County jail, stated that defendant told him "that you can take a small bladed knife and cut a person's major nervous system that would leave him paralyzed" or "a vegetable for life." He talked about a form of torture called "brain cookin," in which a person is tied upside down, all of his hair is shaved off and a small fire is put under him and "it heats their head until their head blows up." Another torture called the "gag treatment" in which some type of liquid detergent mixed with water is poured into a person's mouth until the individual chokes. Another form of torture described by defendant was something called "slow kill," in which a tent large enough to hold an automobile is used. An individual is placed in the tent behind an automobile near the exhaust pipe and is thereby suffocated. He further described a form of torture called "tug of war." He quoted defendant as talking about having kicked Viet Cong officers out of a helicopter at 15,000 feet. Defendant also told the witness that he had caught Vietnamese girls stealing supplies out of a barracks and had inserted pipe flares in their vaginal cavities and ignited the pipe flares.

Another witness testified concerning a letter in which defendant stated "that he knew how to kill in cold blood and that he had already done so." Another witness testified that defendant frequently talked to her about "contract killers," and that he enjoyed killing people because it

was good money.

The record shows that the psychiatrists who testified were in agreement that a sociopathic personality frequently engaged in fantasies and that much of the criminal conduct of a sociopathic personality resulted from efforts to carry out those fantasies. The jury heard the testimony concerning the conversations with defendant without being given a cautionary instruction that there was no corroborating evidence which tended to prove that any of the conduct described had in fact occurred. The jury was given no guidance that would assist them in the determination of whether the conversations to which the witnesses testified purported to recount actual occurrences or whether they were pure fantasy. Absence of such guidance would permit the jury to reach a conclusion as to defendant's "character and propensities," not on the basis of his conduct, but on the basis of his sociopathic fantasies. Under the extraordinary circumstances of this case and in view of the possibility that this may have occurred, we conclude that the circuit court did not, as required by the rule enunciated in *Adkins* and approved in *La Pointe*, "exercise care to insure the accuracy of information considered."

For the reasons stated the judgment of conviction of murder is affirmed but the sentence of death is vacated. The cause is remanded to the circuit court of Du Page County for further proceedings consistent with this opinion.

*Judgment affirmed; sentence*
*vacated; cause remanded.*

JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I agree with the majority's conclusion that there was no error which requires reversal of the murder conviction, but I cannot agree that the fact the trial judge did not give a cautionary instruction requires reversal of the death sentence. Illinois law does not require such an instruction, the

defendant neither sought nor tendered such an instruction at trial, and he does not even now argue that the absence of such an instruction is error. Nevertheless, in what I believe to be an unprecedented holding, my colleagues now say the trial judge's failure to volunteer an instruction which no one ever suggested or requested constitutes reversible error. In my judgment the law is clear that regardless of whether the defendant's multiple claims of torturing and killing, as revealed by the testimony at the sentencing hearing, were true or not, the testimony regarding those claims was significant, relevant and appropriate—if not essential—to an adequate consideration of the sentencing question by the jury. No cautionary instruction was either necessary or proper.

The majority indicates that the precautions taken to preclude the "contaminating influence" of improper information should be at least as great before a jury as in a bench trial. While such a statement is indisputable, the difficulty with the majority's position is that no case cited in that opinion or found by me which considers the bounds of legitimate inquiry at a sentencing hearing suggests the need or use of a cautionary instruction when undisputed but uncorroborated testimony is considered. Instead, this court has approved consideration of a broad range of information from a wide variety of sources subject only to the sensible caveat that the judge must exercise care to ensure that the information is accurate. (See, *e.g., People v. La Pointe* (1981), 88 Ill. 2d 482; *People v. Meeks* (1980), 81 Ill. 2d 524; *People v. Kelley* (1970), 44 Ill. 2d 315, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 297, 90 S. Ct. 1881, *cert. denied* (1971), 403 U.S. 906, 29 L. Ed. 2d 683, 91 S. Ct. 2212; *People v. Adkins* (1968), 41 Ill. 2d 297.) The decisions of this court indicate that the judge's duty to ensure accuracy is met by compliance with the traditional dictates of the adversarial process—a fair opportunity to the opponent to rebut the testimony and offer evi-

dence of his own. *People v. La Pointe* (1981), 88 Ill. 2d 482; *People v. Crews* (1967), 38 Ill. 2d 331; *People v. Mann* (1963), 27 Ill. 2d 135; *People v. O'Neil* (1960) 18 Ill. 2d 461; *People v. Riley* (1941), 376 Ill. 364, *cert. denied* (1941), 313 U.S. 586, 85 L. Ed. 1542, 61 S. Ct. 1118.

Other jurisdictions also allow a wide range of information—including uncorroborated testimony unaccompanied by any cautionary instructions—to be considered during the sentencing process. The United States Supreme Court has strongly reaffirmed its stance that " ' "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." ' " *Roberts v. United States* (1980), 445 U.S. 552, 556, 63 L. Ed. 2d 622, 628, 100 S. Ct. 1358, 1362, quoting *United States v. Grayson* (1978), 438 U.S. 41, 50, 57 L. Ed. 2d 582, 589, 98 S. Ct. 2610, 2615, quoting *United States v. Tucker* (1972), 404 U.S. 443, 446, 30 L. Ed. 2d 592, 596, 92 S. Ct. 589, 591. See also *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Williams v. New York* (1949), 337 U.S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079.

Many of our sister States also require consideration of a broad range of information at the sentencing stage and, as do our opinions, regard the adversarial process as an adequate safeguard for the accuracy of information considered. See *Nukapigak v. State* (Alaska 1977), 562 P.2d 697; *Fair v. State* (1980), 245 Ga. 868, 873, 268 S.E.2d 316, 321, *cert. denied* (1980), 449 U.S. 968, 66 L. Ed. 2d 250, 101 S. Ct. 407, *reh. denied* (1981), 449 U.S. 1104, 66 L. Ed. 2d 831, 101 S. Ct. 903 (approved consideration of testimony detailing defendant's conversations with jailmates, gloating over his misdeeds); *Lottie v. State* (1980), ____ Ind. ____, 406 N.E.2d 632; *Commonwealth v. Frank* (1977), 372 Mass. 866, 362 N.E.2d 895; *Williamson v. State* (Miss. 1980), 388 So. 2d 168; *State v. Aby* (1980), 205 Neb. 267, 287 N.W.2d 68; *Lucas v. State* (1980), 96 Nev.

428, 610 P.2d 727; *State v. Marzolf* (1979), 79 N.J. 167, 398 A.2d 849; *State v. Pearce* (1979), 296 N.C. 281, 250 S.E.2d 640; *Dickinson v. Mueller* (N.D. 1977), 261 N.W.2d 787; *State v. Blight* (1977), 89 Wash. 2d 38, 569 P.2d 1129.

As I understand the testimony in this case, defendant has said that in order to secure information from other Viet Cong prisoners he pushed Viet Cong officers out of high-flying helicopters in Viet Nam; that he also inserted, and then lighted, flares in the vaginas of Vietnamese women caught stealing; and that he spoke of various types of torture killing and indicated he enjoyed killing. The majority speculates that these things may only have been fantasized by defendant, and that a cautionary instruction (the content of which is left to the ingenuity of the judge and counsel) is required to avoid the otherwise prejudicial effect upon the jury of hearing evidence that the defendant claims to have committed these offenses.

In my opinion the majority overlooks the fact that the psychiatrists who testified in this case characterized defendant as a sociopathic personality who would be likely to attempt to carry out the fantasies which he experienced. It is readily apparent from this testimony that whether defendant actually did what he claimed to have done or not, the likelihood that he will pursue his fantasies poses a serious threat to society, evidence of which is clearly admissible in the sentencing hearing.

I would affirm the trial court's judgment and sentence.

CHIEF JUSTICE RYAN joins in this partial concurrence and partial dissent.