NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of the opinion to

request a rehearing. Also, opinions are subject to modification, correction or withdrawal at

anytime prior to issuance of the mandate by the Clerk of the Court. Therefore, because the

following slip opinion is being made available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The official copy of the following opinion

will be published by the Supreme Court's Reporter of Decisions in the Official Reports advance

sheets following final action by the Court.

                                    

               Docket No. 78886--Agenda 5--September 1996.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SHERRELL TOWNS,

                               Appellant.

                    Opinion filed December 19, 1996.

                                    

     JUSTICE FREEMAN delivered the opinion of the court:

     Following a trial in the circuit court of Madison County, a

jury found defendant, Sherrell Towns, guilty of five counts of

first degree murder. 720 ILCS 5/9--1(a) (West 1992). That same jury

found defendant eligible for the death penalty based on the

aggravating factor that he killed two or more individuals. See 720

ILCS 5/9--1(b)(3) (West 1992). It further concluded that there were

no mitigating factors sufficient to preclude the imposition of the

death penalty. Accordingly, the trial judge sentenced defendant to

death on each count. The sentences have been stayed pending direct

appeal to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d

R. 603. For the reasons that follow, we affirm both the convictions

and the sentences.

                                BACKGROUND

     This case involves the execution-style murder of five men in

Madison, Illinois. The State's primary evidence against defendant

came from defendant's own admissions to both his acquaintances and

to police and can be summarized as follows. On the evening of

November 17, 1993, defendant, who was accompanied by Remon Williams

and Michael Coleman, drove his dark green van to the trailer home

of David Thompson. Thompson's trailer was widely known in the

community as a place where drugs could be purchased. The trailer

was surrounded by a chain fence, and its windows were secured with

iron bars. Thompson carried the only key to the trailer and had

complete control over who entered the premises. In fact, it was his

policy to admit only those people whom he knew.

     Defendant and his cohorts gained entry to the trailer because

Coleman knew Thompson. Defendant and Williams sat in the living

room while Coleman went into the kitchen. After a couple of

minutes, Coleman called out to someone who was in a back room. When

that person came out, defendant, Coleman, and Williams all

brandished guns. Defendant had a 9 millimeter pistol, and Coleman

and Williams both carried .380-caliber handguns. According to

defendant, three other men besides Thompson were in the trailer at

the time.

     All four of the trailer occupants were then ordered to get

down on the floor. One of the men, however, reached for defendant's

gun, and defendant shot him in the chest. Although the man "went

down," defendant stated that he did not die from the wound because

he continued to talk the entire time they were there. Defendant and

his accomplices then demanded that the men give them all of their

money, and defendant and Coleman searched the trailer. When no

money was found, Thompson told them that it was kept by a relative

in a neighboring trailer.

     Defendant bound two of the men with duct tape and accompanied

Coleman and Thompson to the trailer next door. According to

defendant, a man, later identified as Jeff Mosby, responded to

their knock on the door. Thompson asked him to get the money, but

Mosby "just kind of stood there." Defendant and Coleman pushed

their way into the trailer and ordered Mosby to get down on the

floor. Instead of complying, Mosby remained standing, with what

defendant characterized as a "what's up type look on his face."

Defendant also acknowledged that Mosby acted as if he did not

really know what they were talking about. Mosby was again told to

get down on the floor, and defendant shot him when he remained

standing. The subsequent search of Mosby's trailer revealed no

money. When defendant and Coleman asked Thompson why there was no

money in the trailer, Thompson told them that Mosby's aunt did not

trust Mosby with the money because he "smokes dope," and that she

must have put it in the trunk of her car.

     Upon their return to Thompson's trailer, defendant bound

Thompson with duct tape. At that time, defendant, Coleman, and

Williams decided to leave. As they started to depart, they saw a

car come down the road so they returned to the trailer. Defendant

and Williams asked Coleman what he wanted to do because "these guys

[knew his] face," but did not know either of them. Coleman

indicated to them that they should just leave them alone. But he

then changed his mind, saying, "[T]hey know me. Let's do them."

Defendant claimed that the four men in Thompson's trailer were then

shot by Williams, who used defendant's 9 millimeter pistol. As the

three were leaving Thompson's trailer, defendant saw a car pull

into Mosby's driveway.

     Thirteen-year-old Candice Branch saw defendant and two other

men in front of Thompson's trailer while she was walking home from

a school program at approximately 10 p.m. on November 17. She heard

one of the men say "let's go do it," or "lets go smoke these."

Branch became frightened and immediately ran home.

     Kimberly Fulton returned to the trailer home she and her

children shared with Mosby at approximately 10 p.m. on the day in

question. As she walked to her trailer, Fulton noticed three men

leave Thompson's trailer. The three men then sped away in a dark

green van which had been parked in front of Thompson's trailer.

Fulton entered her trailer and found Mosby's body sprawled across

the floor. Mosby had been shot once, with the bullet passing

through his left arm and into his chest. When Fulton asked her

children what had happened, they responded that the "boys next

door" had done it. Fulton then went to the trailer next door and

saw that the front door was slightly ajar. Fulton returned to her

trailer and dialed 911.

     When the police arrived, they discovered Cedric Gardner,

Thompson's roommate, lying in Thompson's kitchen. Gardner's hands,

feet, and mouth had been bound with duct tape, and he had been shot

once in the head. Police also found the body of Bedford Jennings,

bearing a similar wound and bound in similar fashion. Thompson's

body was also similarly taped, but it appeared as though he had

pulled the tape apart from his hands. His body was found in the

front foyer of the trailer. The fourth victim, Marion Jennings, who

had not been bound, was shot once in the right side of the head and

once in the chest. All of the victims were dead except for Gardner

and Mosby, who were taken to a hospital where they were later

pronounced dead. Police retrieved various items of physical

evidence from both Thompson's and Mosby's trailers, including the

duct tape, bullet casings, and papers.

     Based on statements given by Fulton and Branch, police sought

the occupants of the dark green van. On the day after the murders,

police stopped defendant while he was driving a dark green van. At

that time, police merely ticketed defendant for driving on a

suspended license. Defendant accompanied police to the station for

an interview after the traffic stop and answered their questions

regarding his whereabouts on the night of the murders. He told

police that he had spent the day with his daughter and then had

gone to his girlfriend's home at 10 p.m. After checking on

defendant's alibi, police informed him that his girlfriend's

statement was inconsistent with his. Defendant then told the

officers that he had met with Michael Coleman and two other men at

about 9 p.m. The foursome traveled to East St. Louis where they

remained until 11 p.m. Defendant then went to his girlfriend's home

where he spent the night. Police eventually released defendant from

custody because they did not have enough evidence to charge him

with the crimes. Defendant left the area to visit a sick relative

in Mississippi on November 21, 1993.

     Meanwhile, police conducted forensic examinations of the

physical evidence found at the scene of the crimes. The bullets

found at both trailers were identified as 9 millimeter, and all

were fired from the same weapon. Defendant's fingerprints were

discovered on the duct tape as well as on the papers found in

Mosby's trailer. On November 22, 1993, police filed a five-count

information against defendant charging him with the murders.

According to the information, all five of the victims died from

gunshot wounds to the head.

     Detectives Scott Sandidge and Rick Weissenborn located

defendant in Cahoa County, Mississippi, and questioned him at the

county jail during the afternoon of November 24, 1993. After

defendant had been advised of his Miranda rights, the officers

showed him the information which charged him with the five murders.

Defendant told the officers that he "didn't kill no five people."

Eventually, defendant admitted his involvement in the murders as

detailed above. Defendant told the officers that he would "stand up

for what [he] did." However, he maintained that he had only shot

two of the five victims. During the statement, the detectives

showed defendant the criminal information which had been filed in

the case. After reading it, defendant stated that it contained an

error because Jeff Mosby had not been shot in the head but, rather,

the chest. At trial, both detectives indicated that such

information had not been released to the general public.

     Defendant testified in his own behalf at trial. He denied

making any of the statements to the police and denied any

involvement in the crimes. Although he admitted that he had rented

a dark green van during the time in question, defendant denied

using it during the evening hours of November 17, 1993. Instead,

both he and Michael Coleman drove Coleman's car to a night club in

St. Louis. At approximately 10 p.m., they went to the home of

Coleman's uncle and met Eric Coleman, Christopher Whitehead,

Yulanda Allen, and a few of her friends. He told Allen that he

would stop by her home later. Defendant and his friends then went

to a fast food restaurant and bought some liquor. He arrived at

Allen's home around 11 p.m.

     In rebuttal, both Marshall Bradley, defendant's cousin, and

Katina Foots, defendant's acquaintance, testified that they heard

defendant admit his involvement in the crimes in a manner

consistent with his statement to police. Defendant made the

statements two days after the murders. Both witnesses stated that

defendant referred to the children who had been in Moseby's trailer

at the time and wondered if they could identify him. Defendant also

stated that he would have shot the children, but did not do so

because he did not think they would be able to identify him.

     Following closing arguments and instructions, the jury found

defendant guilty on all five counts of murder. After the first

stage of the sentencing hearing, the jury found defendant eligible

for the death penalty, as the defendant was over 18 years of age

and had been convicted of murdering at least two individuals. At

the second stage of the hearing, the State presented the testimony

of several relatives of the victims as well as evidence of

defendant's previous convictions for delivery of a controlled

substance and aggravated assault. The State also presented the

testimony of two witnesses who were incarcerated in the county jail

with defendant prior to trial. Neither man heard defendant express

any remorse for the crimes. In fact, one of the men, Michael

Lockett, heard defendant admit to the shootings and state that "he

would live to kill again, look how many [he'd] gotten away with."

     Defendant presented evidence in mitigation consisting of the

testimony of several relatives and friends who related that

defendant had been brought up by his maternal grandmother and

various members of his extended family. Although defendant had been

sick at birth, he overcame his illness and developed into a healthy

child. The witnesses stated that defendant helped around the home

with chores and was obedient. Each testified that defendant enjoyed

a warm relationship with his three children, particularly his young

daughter.

     At the conclusion of the second stage of the sentencing

hearing, the jury found no mitigating circumstances sufficient to

preclude imposition of the death penalty. Accordingly, the circuit

court sentenced defendant to death for each of the five murders.

The circuit court later denied all post-trial relief sought by

defendant.

                                 ANALYSIS

                              I. Trial Issues

                        Improper Cross-Examination

     Defendant first argues that the circuit court denied him a

fair trial by allowing the State to engage in improper cross-

examination. Specifically, defendant points to the following

question posed to him by the prosecutor immediately after defendant

testified that talking to the police can get a person killed:

               "Q. Let's talk about what will get you killed.

          Leaving witnesses alive can do that.

               MR. HAWKINS [defense counsel]: Objection, Your

          Honor.

               THE COURT: Sustained."

Defendant contends the prosecutor later returned to the improper

theme of leaving witnesses alive by referring to defendant's direct

examination. At that time, the prosecutor attempted to ask

defendant about his concern "that witnesses are left around

afterwards--." The prosecutor did not complete the question because

the circuit court sustained defense counsel's objection. In an

unrelated matter, defendant also claims that the prosecutor also

improperly asked him to explain "why police officers with forty

years of experience would lie about a statement [defendant had]

made."

     The State asserts that each of these claims has been waived

because they were not contained in either defendant's pro se post-

trial motion or the post-trial motion prepared by his attorney. We

agree. This court has consistently recognized that the failure to

raise an issue in a written motion for a new trial prevents raising

the issue on appeal. See People v. Redd, 173 Ill. 2d 1, 27 (1996);

People v. Pasch, 152 Ill. 2d 133, 173 (1992); People v. Enoch, 122

Ill. 2d 176, 186 (1988). Thus, we must determine whether

defendant's waiver may be excused under plain error.

     Under the plain error doctrine, courts may address a waived

issue if the evidence is closely balanced or if the error affects

substantial rights. 134 Ill. 2d R. 615(a); People v. Carlson, 79

Ill. 2d 564 (1980). Neither prong of the exception is satisfied in

this case. First, the evidence of defendant's guilt was

overwhelming. Defendant himself admitted his involvement in the

crimes to police officers and acquaintances. Moreover, as noted

above, physical and circumstantial evidence presented at trial was

substantial and uncontradicted. Second, we do not believe that any

of the alleged errors affect a substantial right or call into

question the integrity of the proceeding. We note that two of the

three remarks were the subject of a contemporaneous objection at

trial. In our view, the trial judge's prompt sustaining of the

objection adequately prevented any error from reaching

constitutional proportions. See People v. Hobley, 159 Ill. 2d 272,

315 (1994).

Denial of Appointment of New Counsel

                       for Post-Trial Proceedings

     Defendant next asserts that the circuit court erred by not

appointing a new attorney to argue his pro se post-trial motion

which alleged that his trial counsel was ineffective. The record

reveals that defense counsel had filed a post-trial motion for a

new trial at the conclusion of the sentencing hearing. Shortly

thereafter, defendant filed a pro se "Motion For a New Attorney,"

alleging that defense counsel had filed the motion for a new trial

without first consulting or seeking defendant's approval. Defendant

further complained that his counsel's motion was inadequate to

preserve "all issues of error" for appellate review. Finally,

defendant alleged that his counsel had been ineffective throughout

the proceedings and requested that the court appoint a new attorney

to represent him in the post-trial proceedings. The court denied

defendant's pro se motion for a new attorney on April 19, 1995.

     On that same day, immediately after the circuit court denied

defendant's "Motion For a New Attorney," the court allowed

defendant to file a pro se "Amended Post-Trial Motion." In that

motion, defendant raised numerous allegations concerning

prosecutorial misconduct, judicial bias, and ineffective assistance

of counsel. Specifically, defendant contended, among other things,

that his attorney failed to adequately prepare for trial because he

did not (i) investigate relevant facts and interview "relevant

witnesses," (ii) "utilize available means of discovering

exculpatory evidence available to the State or to discover the

State's case," (iii) explore plea bargaining opportunities, (iv)

have certain physical evidence (i.e., the duct tape and the papers)

examined by an independent forensic expert after the court allowed

the appointment for such and expert, and (v) present mitigation

evidence that was available "that would have prevented the

imposition of the death penalty." The circuit court denied both

counsel's motion and defendant's amended motion.

     Defendant now contends that the circuit court erred by not

appointing a new attorney to investigate and argue defendant's

assertions regarding the ineffectiveness of his original trial

counsel. He invites this court to remand the matter to the trial

court with directions to appoint new counsel and to hold a hearing

on the matter. We decline to do so.

     This court has never held that new counsel must be appointed

every time a defendant presents a pro se motion for a new trial

alleging ineffectiveness of counsel. See People v. Nitz, 143 Ill.

2d 82, 134 (1991). Rather, to determine whether new counsel should

be appointed, the circuit court should examine the factual matters

underlying defendant's claims and, if the claim lacks merit or

pertains to matters of trial strategy, new counsel need not be

appointed. Nitz, 143 Ill. 2d at 134.

     We have carefully examined defendant's claims and conclude

that they do not meet the criteria established in Nitz for the

appointment of new counsel. To begin with, four out of the five

allegations raised by defendant are conclusory and therefore lack

merit. For example, defendant claims that his counsel should have

investigated "relevant facts and witnesses," but he has offered

neither the circuit court nor this court any explanation as to what

or to whom he is referring. Likewise, defendant has not set forth

the nature of the exculpatory information his counsel should have

discovered. Nor does defendant elaborate on how defense counsel's

failure to pursue plea bargaining possibilities was anything other

than trial strategy, particularly where it is not alleged that the

other codefendants were offered pleas. See People v. Palmer, 162

Ill. 2d 465, 477 (1994). Defendant's contention regarding his

attorney's failure to adduce mitigation evidence during the

sentencing hearing is equally without merit. In his motion,

defendant does not reveal the character of the mitigation evidence

to which he alludes, nor does he state how it would have changed

the outcome. Additionally, the record reveals that his attorney did

in fact call a total of eight witnesses during the mitigation phase

of the hearing. Thus, this is not a case in which absolutely no

evidence in mitigation was presented to the jury.

     Defendant's remaining claim, that his attorney should have

presented the testimony of a forensic expert to dispute the State's

fingerprint evidence, fares little better. Trial testimony

indicated that the State's expert, Garold Warner, and two of his

associates concluded that there were 25 "points of agreement"

between defendant's fingerprints and those found at the scene of

the crimes. According to Warner, fingerprint examiners in the

United States tend to use between 8 and 10 points of agreement

before arriving at a conclusion. Based on this evidence, it cannot

be said that defense counsel's decision not to call an independent

expert constituted ineffectiveness. It may very well have been a

matter of trial strategy to not call an expert--a withering cross-

examination as to the points of agreement could only serve to

reinforce the strength of the fingerprint identification in the

eyes of the jury.

     As we stated in Nitz, new counsel should be appointed only if

the pro se allegations show possible neglect of the case. Nitz, 143

Ill. 2d at 134. In the case at bar, however, defendant's

contentions are either insufficient to show possible neglect or

concern decisions made by counsel which were well within the bounds

of proper trial strategy. They simply do not constitute strong and

convincing proof of incompetency when considered against the

totality of counsel's conduct during trial. See People v.

Generally, 170 Ill. App. 3d 668, 677 (1988). For these reasons, the

circuit court's ruling in this matter will not be disturbed.

                       II. Sentencing Hearing Issues

                      Testimony of Victims' Relatives

     Defendant maintains that the circuit court violated his eighth

amendment right to a fair sentencing hearing by allowing members of

the victims' families to testify as to their belief that the death

penalty should be imposed. Specifically, defendant cites as

improper several questions posed by Special Assistant Attorneys

General Keith Jensen and Duane Bailey to the three relatives of the

victims called by the State during aggravation. Both Jensen and

Bailey asked each witness which penalty he or she wanted the jury

to impose. In response, each witness expressed the desire that the

jury impose the death penalty. Defendant concedes that he has

waived this issue because no contemporaneous objection was made

during the hearing; however, he posits that defense counsel's

failure to object constitutes ineffective assistance of counsel.

Accordingly, we will review the claim on the merits.

     Generally, in order to establish ineffective assistance of

counsel, a defendant must show both that counsel's representation

fell below an objective standard of reasonableness and that a

reasonable probability exists that, but for the error, the result

of the trial would have been different. Strickland v. Washington,

466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); People v.

Albanese, 104 Ill. 2d 504 (1984) (adopting Strickland). However, we

may resolve a claim of ineffective assistance of counsel by

reaching only the prejudice component, for lack of prejudice

renders irrelevant the issue of counsel's performance. People v.

Erickson, 161 Ill. 2d 82, 90 (1994).

     The State acknowledges in its brief that the testimony of

David Thompson, Sr., Estella Buckles, and Christine Mosby regarding

the appropriateness of the death penalty was improper under Booth

v. Maryland, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529

(1987), rev'd in part, Payne v. Tennessee, 501 U.S. 808, 115 L. Ed.

2d 720, 111 S. Ct. 2597 (1991). Such a violation, however, is

subject to a harmless error analysis, and, therefore, reversal is

not mandated in every instance. See People v. Scott, 148 Ill. 2d

479, 554 (1992).

     Contrary to defendant's contentions, we are unconvinced that

the outcome in this case would have been different had the

complained-of testimony been properly excluded. The remainder of

the State's case in aggravation was remarkably strong. Indeed, the

murders for which defendant stands convicted were cold-blooded and

methodical. Three of the victims were bound hand and foot and

summarily executed. Another victim, an unsuspecting neighbor who

had no involvement with the drug money, was shot when he

understandably acted confused when defendant came to his door,

displaying a gun and demanding money.

     Additional testimony, which we can only characterize as

disturbing, revealed that after police released defendant from

questioning, he expressed regret over not killing the children who

were in Mosby's trailer because they might identify him. Thus,

defendant's remorse in the case stems not from the killing of five

individuals (two of whom he personally shot), but stems from his

not killing three young children. Defendant also told another State

witness that he "would live to kill again." These facts lead to the

inescapable conclusion that defendant utterly lacked any remorse

for his crimes or rehabilitative potential. In contrast, the

evidence in mitigation was slight--family members and friends

testified that defendant came from a religious household and cared

deeply for his children.

     Accordingly, the State's evidence, coupled with the circuit

court's instruction to the jury that its decision was not to be

swayed by sympathy, passion, or prejudice, compels our conclusion

that the error in admitting the improper testimony was harmless

beyond a reasonable doubt, and that no prejudice resulted to

defendant from its admission. Therefore, we cannot conclude that

"counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having

produced a just result." Strickland, 466 U.S. at 686, 80 L. Ed. 2d

at 692-93, 104 S. Ct. at 2064.

     That said, we stress that our resolution of this issue is

derived from the particular facts of this case and the overwhelming

nature of the State's aggravating evidence at the sentencing

hearing. The case at bar was tried in 1995, some seven years after

the United States Supreme Court's decision in Booth v. Maryland and

four years after its decision in Payne v. Tennessee. As such, there

is simply no reason for either Jensen or Bailey to have asked the

members of the victims' families for their opinions in the manner

revealed in this record. We, therefore, are obliged to alert the

State that the future commission of such errors may not produce a

similar result and caution it that a closer case in

aggravation/mitigation may well result in reversal.

                     Improper Remarks Made to the Jury

     Defendant next maintains that he was denied a fair sentencing

hearing by virtue of certain of the trial judge's remarks which

were made at the outset of the jury selection. Specifically, he

points to a comment made by the judge to a group of prospective

jurors regarding the imposition of the death penalty:

               "If you find that the Defendant is not eligible,

          that's it. The Defendant would be sentenced by the Court.

          If you find that the Defendant is eligible, then we go to

          phase, what is called phase three or a third phase, which

          is the aggravation/mitigation phase. And that is the

          phase where you would be deciding whether or not the

          Defendant should receive the death penalty.

               Based on what you hear at that phase, and again, you

          will be instructed, you would be given instruction by the

          Court that you would have to follow to make that

          determination. If you determine that he should not

          receive the death penalty, then he will be sentenced by

          the Court. If you determine that he should, then that

          would be the sentence imposed.

               As will be explained at that time, all of these

          decisions have to be unanimous decisions. That means all

          twelve people have to make a unanimous decision."

          (Emphasis added.)

Defendant now contends that the emphasized statement may have

misled the jury into thinking its decision to not impose the death

sentence would have to be unanimous. Defendant makes this argument

despite the fact that the remark was made by the court one week

before the jury deliberated its sentencing decision, that it was

heard by only 3 of the 12 jurors eventually impaneled in this case,

and that, even if it were confusing, it was later cured by the

court's giving of jury instructions which correctly set forth the

requirements for the imposition of the death penalty. However,

without addressing the doubtful merits of this claim, we note that

defendant failed to make a timely objection and to include it in

the post-trial motion; therefore, it is barred from review.

     Moreover, we find no reason to excuse the procedural default

under the plain error doctrine. The evidence adduced at the hearing

cannot be said to have been closely balanced, nor did the trial

court's misstatement affect a substantial right. As we just noted,

prior to its deliberations at the conclusion of the

aggravation/mitigation phase of the hearing, the jury was properly

instructed as to the legal requirements for the imposition of the

death penalty. Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989),

relied upon by defendant, did not involve an allegedly confusing

remark to the jury which was later rehabilitated by a proper jury

instruction. Instead, Kubat concerned the effect of an improper

jury instruction itself. Because we believe Kubat is wholly

inapposite to the case at bar, we decline defendant's invitation to

raise a single misstatement made by the judge during voir dire to

the level of improperly instructing the entire jury.

     In a similar vein, defendant also takes issue with a comment

made by the trial judge before a different group of prospective

jurors during voir dire. At the time, the judge was questioning a

prospective juror about why he had indicated on his juror

information card that he would not impose the death penalty under

any circumstances:

               "PROSPECTIVE JUROR: I wouldn't under any

          circumstances. I am, my answer is based on my own

          feelings, that in putting myself in that particular

          situation, if the death sentence was imposed on me, I

          would want it done. And it is not being done at that

          time.

               THE COURT: Okay. But that is not a consideration for

          this jury to determine.

               PROSPECTIVE JUROR: I know it.

               THE COURT: If they in fact carry it out or do not

          carry it out, there is nothing that anyone in this room,

          including myself, can do about that.

               What I am asking you, would you refuse to impose it

          because of that then?

               PROSPECTIVE JUROR: No."

The prospective juror was eventually excused; however, defendant

claims that 2 of the 12 members of his jury heard the exchange. He

argues that the judge's comment improperly minimized the jury's

sense of responsibility over their decision whether to impose the

death penalty.

     Like the other comment made during voir dire, defendant failed

to object to the trial judge's remark at trial and failed to

include the issue in either of his post-trial motions. Accordingly,

the issue has not been properly preserved for review.

     Moreover, defendant's procedural default cannot be excused

under the plain error doctrine. As explained above, the evidence at

the sentencing hearing was not closely balanced. We also disagree

with defendant's characterization of the comment as a deprivation

of his eighth amendment right under Caldwell v. Mississippi, 472

U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985). In Caldwell,

the prosecutor informed the jury during closing argument that its

decision was automatically reviewable by the state supreme court.

On appeal, the United States Supreme Court held that it is

constitutionally impermissible to rest a death sentence on a

decision made by a sentencer who has been led to believe that the

responsibility for determining the appropriateness of defendant's

death sentence rests elsewhere. Caldwell, 472 U.S. at 328-29, 86 L.

Ed. 2d at 239, 105 S. Ct. at 2639. In contrast, the trial judge

here directed his remark to a prospective juror who never sat on

defendant's jury. Although defendant claims that the remark was

made in the presence of two of his eventual jury members, our

review of the record indicates that no similar comment was made to

them by the trial judge when he spoke to them directly. Thus,

defendant's contention is based on the speculation that (i) the two

eventual jurors heard the remark and (ii) they remembered it one

week later during sentencing deliberations. The holding in Caldwell

did not rest on such attenuation, as it was indisputable that the

entire jury heard the prosecutor's closing argument. Even so, the

trial judge's remark was not of the same caliber as those in

Caldwell. Here, the trial judge did not convey the notion that

responsibility for sentencing rested elsewhere. Rather, the judge

correctly informed a prospective juror that his concerns over

whether the sentence would ever be carried out were not to

influence his decision regarding the appropriateness of the

penalty. Put another way, the judge correctly informed the

venireman that the jurors were to follow the law, as set forth in

the instructions that they would receive from the judge. Given

these facts, any error on the part of the trial judge in making the

remark does not rise to the level necessary to meet the second

prong of the plain error rule.

     Nevertheless, defendant argues that the judge's erroneous

statement during voir dire was compounded during the actual

sentencing hearing when the State argued that

               "[y]ou are going to be told that it is in your hands

          whether to kill Sherrell or not. I don't believe that is

          going to be the question. I believe the question was

          decided a long time ago.

               It is not within my hands to kill Sherrell Towns,

          and I use the word kill because that is what you have

          been told previously. It is not within [the defense

          attorneys'] or even [the judge's] hands. It's not in your

          hands to do that.

               Because the actions that dictate a death penalty

          were all caused by Sherrell Towns. He committed the

          offense, not you. Your decision is to execute and sign

          the death penalty verdict form based upon what he did.

          There is no responsibility on your part for what he did.

          No one made him do it, no one asked him to do it. He did

          it of his own free will and his own volition."

     These comments are similar to those this court has previously

upheld in People v. Page, 156 Ill. 2d 258, 284 (1993). As in that

case, we are of the opinion that the prosecutor did not attempt to

suggest to the jury that they were relieved of their responsibility

by defendant's own actions. See People v. Hudson, 157 Ill. 2d 401,

460 (1993). The jury in this case was correctly instructed on its

role in the sentencing process, and we do not believe that the jury

would have interpreted the comment as contradicting those

instructions. As such, the prosecutor's remarks did not run afoul

of the Caldwell decision and do not constitute plain error.

     Defendant also maintains that he was denied a fair sentencing

hearing when the prosecutor told the jury

               "[not to] get caught up in the business about he

          will be in a cage his whole life. That sounds horrible.

          But this cage is the same cage he has been through

          before. The penitentiary system with exercise yards, with

          work programs, with all kinds of facilities.

               And likewise lawyers sometimes either inadvertently

          or intentionally don't get everything out. Instruction

          that you are going to get from the Court will tell you

          that no person serving a natural life sentence of

          imprisonment can be paroled or released, except through

          an order of the governor of executive clemency.

               There is always the loop hole, there is always the

          chance, there is always that little extra business. No

          one can say what will happen." (Emphasis added.)

Pointing to the portion of the statement emphasized above,

defendant claims the prosecutor improperly asked the jury to

speculate as to what might happen if defendant were not sentenced

to death.

     We note that defendant is precluded from asserting this issue

on appeal due to his failure to object to the statement at trial

and his failure to include the issue in the post-trial motions

filed in this case. In addition, the claim does not fall within the

purview of the plain error doctrine because the evidence at the

sentencing was not closely balanced nor is a substantial right

affected. We note that although an argument commenting on the

possibility of defendant's being released and committing future

crimes would be improper (see People v. Gacho, 122 Ill. 2d 221

(1988)), the prosecutor here did not so argue. Instead, the comment

merely restated the jury instruction that persons serving terms of

natural life imprisonment will not be paroled or released except

through executive clemency. See Gacho, 122 Ill. 2d at 262.

           Admission of Gang Affiliation & Other-Crimes Evidence

     Defendant next argues that he was prejudiced during his

sentencing hearing by the circuit court's admission of certain

testimony concerning defendant's (i) gang membership and (ii)

involvement in other crimes. We address each in turn.

     The State called Michael Lockett to testify during the

aggravation/mitigation phase of the sentencing hearing as to

certain statements made to him by defendant while both were

incarcerated in the same correctional center. Throughout his cross-

examination, defense counsel attempted to impeach Lockett by

eliciting from him his motivation for testifying. Defense counsel

intimated, for example, that Lockett was awaiting sentencing for

attempted murder and aggravated battery and was "hoping to get

something" in exchange for his testimony. When Lockett denied the

charge, defense counsel inquired about a pin which was affixed to

Lockett's lapel. Lockett indicated that the pin signified a

"conservative vice lord." On redirect, the prosecutor asked whether

defendant was a gang member. Over a defense counsel objection,

Lockett responded that defendant was a "gangster disciple." Lockett

further indicated that it was "difficult" to testify against a gang

member and fellow inmate because "all types of things could happen"

to him. On re-cross-examination, defense counsel then asked Lockett

whether his gang "[got] along" with defendant's gang. Lockett

admitted that they do not.

     Defendant now contends that the circuit court should have

excluded this evidence of defendant's gang affiliation. This court

has consistently held that evidence of gang affiliation is

admissible as long as the relevance of the evidence is established.

People v. Hope, 168 Ill. 2d 1, 40 (1995), citing Dawson v.

Delaware, 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992).

We note that in this case, it was defense counsel's attempt to

impeach Lockett's credibility by noting his gang affiliation which

opened the door to the State's inquiry concerning defendant's

affiliation and the concomitant risks which attended Lockett's

testimony against another gang member. Indeed, defendant's gang

membership became relevant, as it provided the jurors with a

clearer picture of all the potential motivations behind Lockett's

testimony, thereby aiding them in evaluating the veracity of his

testimony. For example, fear of reprisal might have made Lockett's

testimony more believable. On the other hand, rivalry between the

two gangs might have detracted from its believability. Under these

circumstances, the relevance of the evidence cannot be seriously

questioned.

     Defendant also maintains that he suffered prejudice when

Lockett testified that defendant had told him that it did not

matter whether he was convicted of the five murder charges and to

"look at how many he had gotten away with." Defendant argues that

the remark was uncorroborated, and that the circuit court should

have given the jury some guidance to assist it in determining

whether the purported conversation actually occurred or whether it

constituted "mere bragging."

     Defendant's claim does not persuade. Under the provisions of

section 9--1(e) of the Criminal Code of 1961, a jury is allowed to

hear and consider information during sentencing regardless of its

admissibility under the rules governing the admission of evidence

at criminal trials. 720 ILCS 5/9--1(e) (West 1992). Although we

have recognized that some precautions may be necessary to preclude

the "contaminating influence" of improper information from

influencing the jury (see People v. Devin, 93 Ill. 2d 326, 348

(1982)), we are of the opinion that the jury in this case received

sufficient instruction in assessing the testimony. The circuit

court gave the jury Illinois Pattern Jury Instruction No. 1.02

(Illinois Pattern Jury Instructions, Criminal, No. 1.02 (3d ed.

1992)), which informed the jury that it could take into account a

witness' bias and the reasonableness of his testimony.

     We further note Devin, the sole case to which defendant cites

in support of this argument, is readily distinguishable from the

case at bar. There, several witnesses testified at the sentencing

hearing that defendant had recounted to them detailed, graphic

descriptions of torture and murder. However, psychiatric experts

all agreed that a sociopathic personality (which defendant

possessed) frequently engages in homicidal fantasies. As a result,

this court reasoned that the jury should have been alerted to the

possibility that defendant's descriptions could have been the

product of fantasy and not defendant's actual conduct. Devin, 93

Ill. 2d at 348-49. Lockett's testimony in this case in no way

compares to the testimony given in Devin. Nor are we confronted

with the type of psychiatric testimony which called the Devin

testimony into question. For these reasons, we conclude that a new

sentencing hearing is not required in this case.

             Disproportionality of Defendant's Death Sentence

     Defendant further argues that his sentence of death is

disparate from the natural life sentence received by codefendant

Coleman, who was also convicted of five counts of murder. Defendant

points to the following evidence of disparate sentencing: Coleman

was older than defendant, Coleman was the "mastermind" behind the

crimes, Coleman's prior record was more extensive than that of

defendant, and Coleman's role in the offenses was equal to

defendant's. Defendant maintains that his disparate sentence

violates the constitutional prohibition against the arbitrary and

capricious imposition of the death penalty.

     We begin our analysis of this issue by noting that the United

States Supreme Court has held that the eighth amendment does not

require comparative proportionality review if the death penalty

statute contains provisions that ensure the rational, consistent,

nonarbitrary imposition of the penalty. Pulley v. Harris, 465 U.S.

37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). Our death penalty

statute is such a statute. See People v. Kitchen, 159 Ill. 2d 1, 44

(1994). Nevertheless, this court has previously chosen to exercise

its discretion and has considered whether a sentence of death in a

particular case is disproportionately harsh in comparison with the

less severe sanction imposed on a codefendant convicted of the same

crime. See People v. Bean, 137 Ill. 2d 65 (1990); People v.

Ashford, 121 Ill. 2d 55, 82-90 (1988); People v. Gleckler, 82 Ill.

2d 145, 167-69 (1980). Factors of particular relevance include the

extent of defendant's involvement in the offense, the nature of the

offense, the character and background of the defendant, including

any criminal record, and his potential for rehabilitation. Kitchen,

159 Ill. 2d at 44. Thus, in the past, this court has examined the

facts of the particular case and the evidence introduced at both

the trial and the sentencing hearing. We may also consider, as a

matter of reference, the sentence imposed on a codefendant in light

of his involvement in the offense.

     In this case, the record contains evidence that defendant

asked one of his cousins to participate in the armed robbery. In

addition, defendant supplied the vehicle which enabled the trio to

get to the crime scene. Therefore, we have little difficulty in

dismissing defendant's contention that Coleman was the sole

"mastermind" behind the crimes. There is ample support in the

record for the conclusion that defendant equally took part in the

planning of the crimes. Moreover, once the armed robbery commenced,

the evidence revealed that defendant shot two of the five victims.

The other three victims were shot by codefendant Remon Williams.

There is no evidence in this record that Coleman acted as a

triggerman. It is particularly relevant, in our view, that

defendant admitted to being the first to shoot any of the victims

and to being Jeff Mosby's assailant. Thus, it was defendant, and

not Coleman, who turned the armed robbery into a mass murder. We

note that defendant has supplemented the record in this case with

testimony from Coleman's trial in which one of the children in

Mosby's trailer testified that Coleman shot Mosby. However, we are

also aware of other testimony in the case which revealed that

defendant, not Coleman, shot Mosby. We will not speculate as to how

Coleman's jury resolved this factual question.

     Furthermore, defendant has presented this court with little

evidence of Coleman's character, apart from his prior criminal

history. Although Coleman's prior criminal record may be

quantitatively more severe than defendant's, that is but one factor

in our evaluation. Testimony adduced at both the trial and the

sentencing hearing provides some insight into defendant's character

which we do not have with respect to Coleman. We note that after

being questioned by police and released, defendant fled the state.

Even after being indicted in these crimes, defendant, a father of

three children, could only express regret that he did not kill the

only eyewitnesses to his deeds, the three children in Mosby's

trailer. While awaiting trial on these charges, defendant told a

fellow inmate he would live to kill again. Thus, defendant

exhibited no remorse whatsoever for his crimes and displayed a

chilling lack of rehabilitative potential. On this record, we

cannot say defendant's death sentence is disproportionate to

Coleman's life sentence.

     In summary, we conclude that defendant's conduct must be

considered more culpable than that of Coleman in that it was

defendant's actions which precipitated the gunfire at the trailers.

In light of defendant's character, Coleman's more severe criminal

record, standing alone, does not render defendant's death sentence

disparate. For these reasons, we reject defendant's contentions

that his death sentence is unreasonably disproportionate from the

natural life sentence imposed on Coleman.

                     III. Constitutionality of Statute

     In his final two arguments, defendant challenges the Illinois

death penalty statute (720 ILCS 5/9--1 (West 1992)), asserting it

is unconstitutional because, once a statutory aggravating factor is

found, the defendant bears the burden of persuading the jury that

death should not be imposed. He maintains that the statute thereby

creates a rebuttable mandatory presumption in favor of the death

sentence, which contravenes the eighth amendment. This court has

repeatedly rejected this contention (see, e.g., People v. Burt, 168

Ill. 2d 49, 81 (1995); People v. Simms, 143 Ill. 2d 154, 183-84

(1991); People v. Fields, 135 Ill. 2d 18, 76 (1990)), and we do so

here again today.

     Defendant also argues that although various aspects of the

statute have been found constitutional individually, the cumulative

effect of all the aspects is to render the statute

unconstitutionally arbitrary and capricious. We have considered and

rejected this argument numerous times (see People v. Edgeston, 157

Ill. 2d 201, 247 (1993); People v. Thomas, 137 Ill. 2d 500, 549-50

(1990); People v. Phillips, 127 Ill. 2d 499, 542-43 (1989)), and

defendant offers us no reason to reconsider our past holdings.

                                CONCLUSION

     For the reasons stated, the judgment of the circuit court of

Madison County is affirmed. The clerk of this court is directed to

enter an order setting Tuesday, March 18, 1997, as the date on

which the sentence of death entered in the circuit court of Madison

County is to be carried out. The defendant shall be executed in the

manner provided by law. 725 ILCS 5/119--5 (West 1994). The clerk of

this court shall send a certified copy of the mandate in this case

to the Director of Corrections, to the warden of Stateville

Correctional Center, and to the warden of the institution where

defendant is confined.

                                                                  Affirmed.