THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES GRIFFIS, Defendant-Appellant.

First District (5th Division)   No. 1—88—0139

Opinion filed June 29, 1990.—Rehearing denied July 26, 1990.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Elizabeth Sklarsky and Marie Quinlivan Czech, Special Assistant State's Attorneys, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

This appeal follows a jury trial in which James Griffis was convicted of solicitation to commit murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—1, 9—1), solicitation to commit aggravated battery (Ill. Rev.

Stat. 1985, ch. 38, pars. 8—1, 12—4), solicitation to commit robbery (Ill. Rev. Stat. 1985, ch. 38, pars. 8—1, 18—1), and solicitation to commit arson (Ill. Rev. Stat. 1985, ch. 38, pars. 8—1, 20—1).

We affirm.

The record indicates that on March 22, 1985, defendant approached Joey McLain, then 15 years old, to ask McLain to set fire to a trailer in which defendant had once briefly lived with his estranged wife, Marilyn. Defendant also asked McLain to rob and beat defendant's grandmother, Marsha McMahen, and to murder defendant's uncle, Louis McMahen. McLain declined to be involved in the murder of defendant's uncle but, at defendant's urging, contacted Scott Epley, also then 15 years old, for the task.

Defendant's actions were apparently attributable to circumstances surrounding the deterioration of his marriage. Briefly, defendant and Marilyn were married in September 1984. Within days thereafter, Marilyn was hospitalized for a heart condition and underwent open-heart surgery. For about one month following her release from the hospital in October 1984, defendant and Marilyn lived together in a trailer. Marilyn twice left defendant and, in December 1984, began a relationship with defendant's uncle. Defendant, a previously diagnosed manic depressive, admitted himself to the mental health unit of Christ Hospital in January 1985. In February 1985, while still at Christ Hospital, Marilyn served defendant with notice that she had filed a divorce proceeding against him.

During January and February 1985, when she was not hospitalized, Marilyn lived with defendant's parents.

Joey McLain lived across the street from where defendant's parents lived in Oak Lawn. He testified at trial that either on March 15 or 16, 1985, defendant telephoned him, inquiring after Marilyn.

On March 22, 1985, McLain testified, defendant showed him the trailer that defendant wanted McLain to set on fire. Defendant had indicated to McLain exactly how to accomplish the task and told McLain he would be paid for his effort. That same day, McLain testified, he went to Joliet with defendant and delivered a note to Marilyn. McLain stated that, during the drive, defendant told him that he wanted Martha McMahen, his grandmother and Louis McMahen's mother, beaten. Defendant indicated she had money in the trailer where she lived and that McLain could take whatever he wanted.

McLain testified that on March 23, 1985, he went with defendant to see Scott Epley, a friend of McLain's. McLain explained that defendant had asked McLain to kill Louis McMahen. McLain said he would not murder McMahen, but that he knew of someone who

would, and suggested the name of Scott Epley. Defendant drove McLain and Epley to where McMahen worked, pointed out McMahen's vehicle, and indicated how he wanted McMahen murdered. McLain testified defendant said he would pay $400 for the murder.

McLain testified that when he arrived home that night, police officers were there. Marilyn Griffis was also present. At that time, McLain related the events of the day to the police and agreed to cooperate with them. McLain subsequently was fitted with a concealed transmitter, or "wire," and a tape recorder. He recorded conversations with defendant on March 28 and 29, 1985. Those conversations corroborated McLain's testimony concerning the solicitation for murder.

Epley also testified at trial on behalf of the State and corroborated McLain's testimony concerning defendant's solicitation for the murder of Louis McMahen.

Defendant's motion for a new trial was denied on September 4, 1986, and this appeal followed.

OPINION

■ Defendant first argues that comments made by the assistant State's Attorney during opening and closing summations were improper and violated defendant's right to a fair trial under both our Federal and State constitutions. Defendant concedes no timely objection was made in the trial court as to any of the comments identified by defendant as being improper and that defendant's post-trial motion similarly failed to include the contention that the comments were improper. Although both steps are necessary to properly preserve arguments on appeal (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124), defendant urges us to consider the impropriety of the comments under the plain error doctrine (107 Ill. 2d R. 615(a)). Under the doctrine of plain error, we may consider matters not otherwise properly raised in the trial court where the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.

■ The evidence in the instant case was anything but closely balanced. Both McLain and Epley testified that defendant solicited their services, together or independently, to murder Louis McMahen. McLain provided further testimony to establish that defendant solicited his services for the other offenses charged. The tapes corroborate the testimony of McLain and Epley. Thus, we find no basis to disturb the verdicts rendered below on the basis of the evidence presented.

In considering the magnitude of the argued errors, we find it helpful to address, together, the allegedly improper comments identified by defendant with the reason defendant gives for the claimed impropriety.

First, defendant identifies comments which, defendant argues, implied the police would not have investigated or arrested him if he was not, in fact, guilty. The following comments are from the State's initial comments at the close of evidence:

"We [(the assistant State's Attorneys)] played you [(the jury)] the *** entire tape. Twenty minutes of music we sat there and listened to so that you knew from the time that tape recorder was on [McLain's] body to the time that he ended his conversation with this defendant that you heard everything. The questions, the directions, the request made on those tapes were from [defendant], not Joe McLain.

*** On March 29th those tape recordings, or the one tape recording from the 29th, [was] taken off [McLain's] body. The police then arrested [the defendant] later that evening, and that was the conclusion of the investigation, once [the police] knew what Joe McLain and Scott Epl[e]y told the police was true."

And:

"I [(one of the assistant State's Attorneys)] think you'll agree with us at the end of the case that [the defendant] is guilty as charged."

Defendant also notes the following comments made during rebuttal:

"I [(one of the assistant State's Attorneys)] couldn't disagree more [with defense counsel's assessment in his closing that defendant was 'kind of stupid']. [Defense counsel] says [the defendant] is stupid. If he was stupid he would have walked into [Louis McMahen's place of employment] with a bat in his hand and whacked [McMahen] in front of about fifty people, if he was stupid."

And:

"Remember when I said [during opening statement] it[']s a crime of words, command[ment], encourage[ment], request[?] And there's a big difference between bar room talk and solicitation to commit murder. That's why [the police] had to present a phone book or paperwork to various judges and [the police] had to go before all kinds of judges, had to get orders written or prepared. They don't take this lightly.

I mean [the police] did everything by the book because this

was more than bar room talk. This is serious business."

And:

"Remember what the tapes said. Remember what the witnesses said. It doesn't matter if [McLain and Epley] were going to do it or not. And I think Joe McLain, if I recall the evidence correctly, *** said on the stand, and I don't know whether [McLain] would have or not, but he said he probably would have [committed the offenses for defendant]. He seemed like a punk enough to us [(the assistant State's Attorneys)]. I think he would burn down the trailer. He said he would have done it."

We do not agree with defendant that the above comments encouraged the jury to base its verdict on personal opinions, rather than evidence. Contrary to defendant's argument, the comments made in the initial closing statement by the State, when read in context, merely set out a chronological summary of the events leading up to defendant's arrest and are otherwise proper as inference based on evidence presented at trial. While we do not condone the statement that the assistant State's Attorney believed the jury would agree with the State, we simply do not agree that that particular statement can be construed as encouraging the jury to base its decision on personal belief rather than as a statement of what the evidence would prove, at the trial's end.

As to the other comments above, made during the State's rebuttal argument, we conclude each was invited by defendant's counsel. The comment as to defendant being "stupid" was clearly in response to defendant's counsel's own statement that, while he was not suggesting defendant was a "good guy," he believed defendant only to be "kind of stupid." The comments with regard to the seriousness of defendant's statements were invited by defendant's counsel's characterization, in his opening statement, that defendant's solicitations were merely "bar talk." Like the statement above concerning what the assistant State's Attorneys believed the jury would conclude, we cannot condone the comment that the assistant State's Attorneys believed McLain was "punk enough" to commit the offenses. However, we conclude the statement can reasonably be construed as a response to argument made by defendant's counsel that defendant's solicitations were not to be taken seriously.

Defendant also argues that the State implied the jury had a duty to convict defendant because the jury was urged to "send a message" through its verdict. Defendant cites the following portion of comment by one of the assistant State's Attorneys:

"As members of the jury, as members of our community,

neighborhood, you have a duty, a responsibility, to decide the guilt or innocence of somebody. You have a duty to decide and send a message, send a message to him, and when you send a message to him you send a message to the community at large. No, if you have problems, you can't solve your problems by recruiting fifteen and sixteen year old punks in the neighborhood, or recruiting anybody for that reason to commit crimes.

You can't ask someone, or tell someone, I want you to kill Uncle Lou and this is how I want you to do it, and this is where you do it and how you do it. You can't do that. You send a message out. It's not a defense that someone ran away with his wife. That's no defense. You send a message and make that message clear that when you do the things Mr. Griffis did, what Mr. Griffis did back in March of '85, that you have to answer to the law. What you did was wrong. The People of the State of Illinois have proven that through live witnesses, through tape recordings, and you are guilty as charged. I am confident when you use your common sense and your every day experience, that is the only result that you can reach, and I ask you to do that."

Contrary to defendant's assertions, we do not believe the above comments could have operated to shift the jury's focus from the evidence to the message that a guilty verdict would send. Rather, the comments are fairly interpreted as stating that defendant's conduct constituted criminal conduct and such should not be tolerated.

Defendant next argues that the State disparaged defendant's counsel by accusing him of employing improper tactics. Defendant cites to the following portion of rebuttal argument, asserting the State, through those comments, attempted to indicate that defendant's counsel put Louis McMahen on the stand to shift the jury's focus from the defendant:

"You know, [defendant's] counsel made several arguments. I'd like to respond to them real quick. *** [H]e read the indictment several times, and I'm glad he did, because from what I heard of his argument, Uncle Lou is on trial and Marilyn Griffis is on trial here. But they're not. He's the focus of your attention, James Griffis, whether counsel wants you to focus on him or not. He's the man that's charged with these crimes.

Uncle Lou's lifestyle and Uncle Lou's morality, and Marilyn Griffis' lifestyle and her morality, they are not on trial here. This guy is fifty years old. If he wants to go and get involved with some woman, I think he's old enough to make up his own

mind and to what he wants to do. He's not on trial here for what he did. [The defendant] is on trial."

Defendant argues the State also insinuated defendant's counsel acted improperly in impeaching Scott Epley by the following comments:

"[Defense counsel] says Scott Epley testified so that he would get out of his juvenile car theft case. Where's the evidence of that? Why didn't [defense counsel] ask him when he was on the stand? Why didn't [defense counsel] say ['] was the State going to do something for you on your car theft case?['] Why didn't he ask him that? But instead, [defense counsel would] rather have you guess as to what's going on instead of presenting evidence. There's not one bit of evidence on this trial that Scott Epley is going to get any type of consideration whatsoever in [j]uvenile [c]ourt for that car theft case, and that's the only evidence.

You can guess as to what happened, but you'd be violating your instructions. The instructions are to decide the case on the evidence.

* * *

[Defendant's counsel] says some other things that apparently accuses Detective Smith of fabricating or conveniently forgetting crucial, crucial evidence. What's this crucial evidence? That Scott Epley, when he was eleven years old, had some type of adjudication against him in a juvenile court for a battery[?] What does that have to do with this case? Anything? If there's a reason, [defendant's counsel] didn't provide us with one. I don't know of one. It has nothing to do with it. Another puff of smoke."

We believe the above comments were invited by defendant's counsel's closing statements. In his closing argument, defendant's counsel argued that Marilyn and Louis McMahen were not credible witnesses. Defendant's counsel pointed to the fact that McMahen insisted he and Marilyn did not have sexual intercourse prior to their marriage despite evidence that they shared a bedroom for years before the marriage and that Marilyn could not remember when they had, in fact, had intercourse.

Defendant's counsel similarly invited the comments regarding Epley. Counsel argued to the jury that Epley had a motive to testify because he "might be hoping to get a reduced sentence" in his pending auto theft case. Defendant's counsel had also informed the jury that Epley had been convicted of battery as a juvenile.

Last, defendant argues the following comments were an improper attack on defendant's credibility and were not based on the evidence:

"When the defendant takes the stand and testifies, ladies and gentleman, I ask you to view his testimony as you view all other witnesses. What does he have to gain? What does he have to lose? As he takes that witness stand he has the most to gain and the most to lose. Who has the motive to lie here? Who has the motive to squirm up there when he's asked direct questions and he doesn't give direct answers?"

We do not interpret the above comments to represent an improper attack on defendant's credibility. Rather, the comments suggested to the jury that defendant's testimony should be considered in the same light as any other individual's testimony.

Because we do not conclude any of the above comments are of such magnitude as to have denied defendant a fair trial, we find no reason to disturb defendant's convictions for that reason.

■ The next issue raised by defendant concerns whether the trial judge improperly admitted Marilyn's testimony that she left defendant because he repeatedly beat her. Defendant argues that testimony was irrelevant to the crimes charged and its admission was prejudicial. Again, defendant concedes he failed to properly preserve the issue for review, but urges the court to consider the argument under the plain error rule.

The record indicates that immediately after that testimony was elicited, the trial judge called a side bar and inquired as to the relevancy of the testimony. The trial judge sustained defense counsel's objection, made during the side bar, to admit into evidence photographs of Marilyn, which apparently showed evidence of the beatings. The record indicates defendant's counsel made no objection to the testimony itself during the side bar.

Nevertheless, the testimony itself was proper to the extent it was in response to testimony elicited by defendant's counsel in the cross-examination of Ruth Panzica that defendant loved his wife and that the reason she left him was because of defendant's mental condition.

■ Defendant last argues that his sentences should be reduced. Defendant was sentenced to concurrent prison terms of 11 years for solicitation to commit murder and three years for each of the offenses of solicitation to commit robbery, solicitation to commit arson, and solicitation to commit aggravated battery.

Defendant contends, generally, his sentences were excessive in light of his age, the absence of a criminal record, save for a misdemeanor conviction for battery, and because, shortly before his arrest,

defendant was a skilled worker with a steady record of employment. Defendant also urges the court to note the deterioration of defendant's mental condition in the months preceding his arrest.

In the absence of an abuse of discretion by the trial court, we have no basis upon which to disturb the sentences imposed (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344), and must decline to substitute our own judgment of what we might consider more appropriate sentences. We note the sentence imposed was well within the maximum terms of imprisonment provided by statute for each of the offenses for which defendant was convicted (see Ill. Rev. Stat. 1985, ch. 38, pars. 8—1, 12—4, 18—1, 20—1, 1005—8—1). And, although the circumstances noted by defendant are certainly important mitigating factors, we cannot conclude those circumstances establish that the sentences imposed constituted an abuse of discretion.

Affirmed.

MURRAY and GORDON, JJ., concur