FOURTH DIVISION 

DATE:  

No. 1-98-0150

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

DARRYL MATTHEWS,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

William Prendergast,

Judge Presiding.

JUSTICE SOUTH delivered the opinion of the court:

Defendant, Darryl Matthews, was charged with the first degree murder of Michael Thurmond.  Following a jury trial, he was convicted and sentenced to 36 years in the Illinois Department of Corrections.

Prior to trial defendant filed a motion to suppress his inculpatory statement.  During that motion the State called Detective Luther Samuel of the Maywood Police Department, who testified that he was assigned to investigate the murder of the victim, Michael Thurmond.  On March 16, 1996, he received a phone call from Attorney Barry Schmarak, who informed him that he represented Darryl Matthews and that he would be in the station with the defendant at 10:00 a.m.  

At 10:00 a.m. Attorney Schmarak arrived alone.  He told Detective Samuel that he had spoken with defendant's father and only wanted to know what the charges against defendant were and if, in fact, an arrest warrant had been issued against him.  According, to Detective Samuel the attorney never indicated that he had spoken with defendant.  Defendant never appeared at the Maywood police station that day.  

Defendant was in fact arrested approximately two weeks later on April 4, 1996, after further investigation.    

At the police station both Detective Samuel and Detective Gude advised defendant of his Miranda warnings from a pre-printed form.    They read the rights out loud to him and then had him read  the form.  Defendant was then asked if he understood his rights, to which he responded he did.  Defendant initialled each right stating he understood it and signed and printed his name at the bottom of the rights form.  

Defendant agreed to waive his rights, and at that time the detective notified Assistant State's Attorney Fioti of the Felony Review Unit.  When ASA Fioti arrived at the police station, he also read defendant his Miranda rights from a pre-printed form, which defendant initialled and signed, evincing that he understood his rights and wished to waive them.   At that time, defendant gave an inculpatory statement.   Defendant stated that he had not been made any promises or threats in return for his statement and that he had been offered something to drink and eat and had been allowed bathroom privileges.  

Detective Samuel further testified that at no time subsequent to defendant's arrest did he indicate that he wanted to invoke his right to remain silent, that he had an attorney, or that Barry Schmarak was his attorney, or that he wanted to wait for his attorney to arrive before being questioned.  Attorney Schmarak never appeared at the police station on April 4th, nor did he call.

During cross-examination, Detective Samuel testified, contrary to his direct examination, that Attorney Schmarak never indicated to him that he represented defendant but that he had spoken with defendant's father.  It was Detective Samuel's understanding that the only reason the attorney was there was to find out if there was an arrest warrant for defendant.  At no time did the attorney tell him that he did not want defendant interrogated outside his presence.   He admitted they exchanged business cards but that it was his impression that the attorney wanted to know if "anything developed in the case."  After defendant was arrested on April 4th, he never informed him that an attorney had been in contact with the police on his behalf.

Attorney Barry Schmarak testified on behalf of defendant.  He was retained by defendant's father to represent defendant on  March 13, 1996, for the amount of $500.  Defendant came to his office on March 15, 1996, and at that time Attorney Schmarak telephoned the Maywood Police Department and informed them defendant would surrender to them the next day.  On March 16, 1996, Attorney Schmarak appeared at the Maywood Police Department and spoke with Detective Samuel, informing him that he represented defendant who was scheduled to surrender himself at 10:00 a.m.  However, by 11:00 a.m., defendant did not appear, and Attorney Schmarak exchanged business cards with the detective and told him that he had instructed his client not to talk to the police and that he did not want the police to interrogate defendant in the event he was arrested and that he, the attorney, wanted to be present during any questioning of his client.  Although defendant was subsequently arrested on April 4, 1996, the attorney, was never notified by either the defendant's father or the police department.  Although the attorney never filed an appearance on defendant's behalf or did any other legal work for him, he did represent him at the time of his arrest on April 4th.  When the attorney spoke with defendant's father several months after defendant's arrest, he was informed that the family had retained another lawyer to represent Darryl.  

Defendant, Darryl Matthews, testified that he was arrested on April 4, 1996, and brought to the Maywood Police Station.  At that time, he was represented by Attorney Barry Schmarak, whom he had met and spoken with on several occasions before that date. The attorney told defendant that he did not want him to speak with anyone and that he had already informed Detective Samuel that the defendant was not to be questioned without his lawyer being present.  The attorney had also advised him to surrender to the police.   On the date of his arrest, he requested that Detective Samuel allow him to make a phone call.   That request was denied because the detective informed him that he was only being questioned and that a phone call was unnecessary.  

Detective Samuel told defendant to sign a waiver, which, according to the detective, was a routine matter.  The waiver was a copy of the Miranda warnings.  The rights were read to him by Detectives Samuel and Gude.  However, defendant refused to sign a waiver regarding his right to an attorney and informed them that he, in fact, had a lawyer.  Detective Samuel told defendant that his lawyer had been in contact with the police department, at which time defendant replied that he wanted his attorney present.  Detective Samuel persisted in his request that defendant sign the waiver, insisting that a lawyer was not necessary because this was a routine matter.  Eventually, defendant signed the waiver because he believed that it was normal procedure to sign such a waiver.  He gave a statement, both written and oral, about the facts surrounding the shooting and testified that he did so willingly and voluntarily.  Again he requested that he be allowed to make a phone call.  Again, this request was denied.  The first time defendant was allowed to make a phone call was when he was at the Cook County Jail, and that phone call was made to his mother, not his attorney.  In fact, defendant never contacted Attorney Schmarak.  Defendant was questioned by  both the police officers and an assistant state's attorney, who also advised defendant of his Miranda warnings.  When the ASA told defendant he had a right to a lawyer, defendant responded that he had one, to which the ASA responded that defendant was "under the influence" and that "it was still routine." While in defendant's presence, Detective Samuel told the ASA that he had spoken with defendant's lawyer; however, the ASA continued to question defendant

Defendant also testified that when he first appeared before a judge in court, he did not inform him that he was represented by a lawyer nor did he ever attempt to contact Attorney Schmarak.  

In rebuttal, Detective Samuel testified that defendant never asked to make a phone call while he was in custody, and that had he made such a request, it would have been granted.  He also testified that he never told defendant that it was just routine procedure to initial and sign the Miranda warnings.

The motion was denied, and the matter proceeded to trial.

Keith Herron gave a statement to the Maywood Police, Assistant State's Attorney Karen Stratton and testified before the Grand Jury that on March 5, 1996, he and Michael Thurmond were walking eastbound on 4th Street in Maywood, Illinois, when they met the defendant.  In his statement, Herron indicated that he had known defendant for approximately two years when he and defendant were members of the Gangster Disciples.  Defendant and the victim began arguing, so Mr. Herron walked away from them.  He took approximately 4 or 5 steps when he heard gunshots.  When he looked back, he saw the victim fall to the ground and defendant standing over him pointing a  chrome or nickel-plated gun at the victim.  At that time Mr. Herron started running, and as he did so, he heard two more gunshots coming from the direction of the victim and defendant.  He ran a distance of two blocks to his grandmother's house and ran onto the back porch.  When he got to the porch he heard at least one more shot.  He thought that he heard some scuffling and someone moaning as he left the porch.  Herron ran to his cousin's house and then went back to his grandmother's home.  As he walked up the front porch, he saw the victim laying face up and Officer Wade was standing over him.  He overheard the victim tell the officer that defendant was the one who shot him.

At trial, Keith Herron denied everything and testified that the only reason he said the things he did was because he had been locked up for three days and wanted to go home.

Assistant State's Attorney, Karen Stratton, testified to the contents of Keith Herron's statement to her which were consistent with the testimony he gave to the Grand Jury.  She also published the transcript of the Grand Jury proceedings to the jury wherein Mr. Herron testified he saw defendant shoot the victim on March 5, 1996. 

Melissa Collins testified that on the evening of March 5, 1996, she and her fiance, Airrion Smith were seated in a parked car in front of Mr. Smith's home in Maywood, Cook County, Illinois, when she heard a series of gunshots.  Shortly thereafter she observed two black males running down the street, one approximately a car length in front of the other with a third black male following, running approximately four car lengths behind them.  The first man ran to the back of a house that she knew belonged to a Keith Herron.   The second man behind him ran onto the front porch of this house and the third man ran in the opposite direction.  She was unable to identify any of these men.   At that time, her fiancee Airrion exited their car and walked over to the Herron house, at which time a police officer arrived on the scene and engaged them in conversation regarding what they had seen.

Airrion Smith testified that on the evening of March 5, 1996, he was seated in a parked car in front of his home with his fiancee, Melissa Collins, when he heard four gunshots which sounded from a block away.  At that time he observed two black males running down the street, one in front of the other by a distance of five or six feet.  The man in front ran to the rear of a house belonging to his neighbor, Keith Herron.  The man behind him ran onto the front porch of that house.  At that time, Mr. Smith exited his car and went to the front porch, where he observed the victim, Michael Thurmond, lying face up on the porch, bleeding from a gunshot wound.  At the same time, a police officer arrived at the scene and began asking the victim who shot him, to which Mr. Smith heard the reply, "Darryl Matthews."  Mr. Smith knew that defendant as well as Keith Herron belonged to the Gangster Disciples street gang and that the victim was a member of the Unknown Vice Lords, a rival gang.   Mr. Smith testified that he was a former member of the Gangster Disciples and that he had a prior felony conviction for unlawful use of a weapon.

Howard Howell testified that he was at home on the night of the shooting when he heard an argument outside his window.  When he looked out, he observed three men, two of whom were arguing with each other.  A few minutes later he heard gunshots and looked out of the window again.  This time he saw  three black men running across the street.  It appeared to him that two of them were chasing the other one, who fell down and got up and continued running.  At that time he called the police.  He did not see who fired the gunshot and he never saw the faces of these individuals.  The only descriptions he could give were  clothing and weight, height and race.

Officer Arian Wade was the first Maywood police officer to arrive at the scene.  He observed the victim lying on his back on the front porch of a house.   At that time the victim was still conscious but appeared to be in pain.  When Officer Wade asked him if he was okay, the victim replied he was about to die. Officer Wade pulled up the man's shirt and observed a gunshot wound to the chest which appeared to be in the heart.  He informed the young man that he was, in fact, going to die and asked him who shot him.  The victim replied Darryl Matthews shot him.   Officer Wade remained with the victim until the paramedics removed him from the scene in an ambulance.

Detective Luther Samuel testified that Keith Herron was identified as being at the scene of the shooting in a line-up by a witness who was also present at the scene. Mr. Herron was placed under arrest so that he could be placed in a line-up after he indicated he was going to change his story regarding the events surrounding the shooting.  Mr. Herron expressed some reluctance to talk to Detective Samuel out of fear of gang retaliation.  However, he agreed to cooperate in the investigation, gave a statement, and was taken to the State's Attorney's office to speak with an assistant.  Mr. Herron never denied being at the scene of the shooting on March 6, 1996.  Detective Samuel arrested defendant on April 4, 1996.

The medical examiner, Dr. Bryan Mitchell, testified that an autopsy of the victim revealed that he died from a gunshot wound to the back with no evidence of close-range firing due to the lack of gun powder soot on the clothing.  The State rested.  

The defendant's first witness was Reverend Grafton Bowers who testified that defendant grew up in his church and that his reputation as to being a peaceful individual is very good.

Defendant testified he had been friends with the victim when they were both members of the Unknown Vicelords street gang but that it ended after he, defendant, left the gang.  The victim and other members of the Unknown Vicelords attacked him on several occasions.  On one occasion he was chased by the victim and his friends with guns.  On another occasion when he was sitting in his car at a traffic light, victim pulled up next to him in another car, got out and began shooting at his car several times.  On March 5, 1996, he encountered the victim who was with someone wearing a mask.  At that time, the victim told defendant he should kill him because he was alone and not with his friends.  He then pulled out a gun and pointed it at defendant who started backing up and telling him it did not have to be like that.  The defendant ran and ducked behind a car, at which time the victim began firing the gun at him.  Defendant had a gun and began shooting back as he attempted to flee from the victim.  The other individual who was accompanying defendant ran from the scene.  When the victim shot at defendant again, defendant fired back and observed the victim fall to the ground and get back up. Defendant testified it was possible the victim fell because he had been shot in the back.  The other individual ran back to where the victim was, picked up something and ran off again, firing at defendant as he did so.  Defendant estimated that he fired three shots and that at least four or five shots were fired at him.  Defendant further testified that the victim fired at him first and that the only reason he fired back was because he was in fear of his life.  

Defendant threw the gun into a garbage can by a restaurant.  After he was arrested, he gave the police a statement which was consistent with his testimony at trial.  He also told the police that he had several violent confrontations with the victim prior to the date of the shooting.  After signing the statement, he did not read it.  He denied telling the Assistant State's Attorney that he shot the victim in the back.

The next defense witness was Christopher House.  On February 18, 1996, he was driving his car.  Defendant and several other people were passengers in the car.  When he stopped at a traffic signal, another car pulled up next to it and Michael Thurmond, whom he had just met two days earlier, got out, put on a ski mask, raised his hand with a gun and began firing at his vehicle, hitting the windshield.  He estimates Michael Thurmond fired approximately five to six times at his car.  He went to the police station to report the incident but left before his statement could be taken because he was late for work.

Ted Johnson testified he attended a party at Navy Pier with defendant during the Christmas holiday in 1995.  As he was leaving the party, he saw Michael Thurmond and some of his friends pointing at him, at which time they started chasing him.  As he was running he could hear gunshots being fired in his direction.

On February 18, 1996, he was in Christopher House's car with defendant and two other individuals when they stopped at a traffic light.  At that time another car pulled up, Michael Thurmond got out with a gun and shot at their car several times.  He never reported either incident to the police.

Officer Mike Palazzo of the Maywood Police Department testified that on March 5, 1996, at approximately 11:00 p.m.  he spoke with Howard Clayton, who told him that  he had heard gunshots and looked out of his window, whereupon he observed one male black dressed in a black leather, waist-length coat fire two shots at the victim, who fell in the middle of the block.  Mr. Clayton also told him he saw the victim get up and run as he was being chased by two individuals.  In his report, Officer Palazzo indicated three bullet casings and one projectile were found on the sidewalk in the vicinity of the shooting, although he never actually located these items as he was searching the area with the other officers.   He also spoke with Airrion Smith  and indicated in his report that 

Mr. Smith observed the victim falling down on the porch, and that this conversation took place before he spoke with Howard Clayton.

Detective Samuel was called as a defense witness.  He testified he spoke with Howard Clayton, who gave him descriptions of the people he saw after the shots were fired.  He observed three male black subjects, two of whom were standing on the corner and another subject east of them.  He then saw the two male blacks run down the street and offender number one  fire shots at them, whereupon one of the subjects fell to the ground, got up and continued running.  He next saw Howard Clayton, also known as Howard Howell, at the police station to view a line-up.  Prior to the line-up, Mr. Howell did not tell him that he saw the person's face but he picked out an individual in the line-up as the subject standing on the corner.  That person was Keith Herron.

Barbara Turner testified that she has known defendant all of his life and he has a reputation for being very peaceful.  The defense rested.

Patricia Anos was called on rebuttal.  She is a court reporter assigned to Maybrook.  On April 22, 1997, she was assigned to courtroom 107 of the Maybrook Court house in Maywood, Illinois, and reported the proceedings regarding defendant.  She rebutted certain portions of defendant's testimony at trial regarding whether he knew the police were looking for him in connection with Michael Thurmond's shooting and whether he retired from the Gangster Disciples since he was in Cook County Jail. 

Her notes also reflected that defendant testified that after he spoke with the Assistant State's Attorney he read and corrected his statement and then signed it, and that it was an accurate summary of what he told the State's Attorney.  In that transcript he also admitted to shooting Michael Thurmond in the back.

Detective Samuel testified on rebuttal that Assistant State's Attorney John Fioti gave defendant his Miranda warnings, which defendant waived, and agreed to speak to him regarding the shooting death of Michael Thurmond.  After he made this statement, ASA Fioti asked defendant if he could write out the statement which defendant could read and correct to make sure it was a complete summary of what he had said, to which defendant agreed.  The statement was in fact written out, and defendant made corrections after reading it aloud.  Defendant then signed the statement, along with ASA Fioti and Officer Samuel.

The statement was then published to the jury. In it, after being advised of his constitutional rights and stating he understood each of those rights and stating that he understood the ASA, a lawyer, was not his lawyer, defendant stated he had known the victim for approximately five or six years and that the victim was a member of the Unknown Vice Lords street gang.  Defendant used to be a member but left that gang and joined the Gangster Disciples.  He had been having confrontations with the victim for a while.  On March 5, 1996, he, defendant, possessed a .380 automatic handgun with four bullets in the clip and one bullet in the chamber.    He saw a gun in Michael Thurmond's hands after he and Thurmond had a heated confrontation.  Defendant had his gun in his pocket but took it out after seeing Thurmond reach for his gun.  Shots were fired and the victim ran away.  Defendant stated Thurmond's pistol fell to the ground and he picked it up and ran after Thurmond.  Thurmond was shot in the back and then ran up on the porch of a house, while defendant ran in the opposite direction towards his friend's house.

The statement also indicated that defendant was treated well by the police and the ASA and that no promises or threats were made to him in return for his statement.  He was offered something to drink and eat and was allowed to go to the bathroom.  The statement was signed by defendant, Detective Samuel and ASA Fioti.  Defendant never stated that there was a third person or that Keith Herron was present.  

Detective Samuel further testified that the Maywood Police Department had no record of Christopher House attempting to make a report regarding the shooting incident on February 18, 1996.

John Fioti testified he was a lawyer employed by the Cook County State's Attorney's office.  On April 4, 1996, he was assigned to the Felony Review Department at the Maybrook Courthouse in Maywood, Cook County, Illinois.  Prior to speaking with defendant on that date, he advised him of his Miranda rights.  Defendant stated he understood the rights and agreed to waive them.  At that time he gave a statement admitting his involvement in the shooting of Michael Thurmond.   Mr. Fioti wrote down the three-page statement and afterward had defendant read over the statement.  Mr. Fioti also read the statement out loud to defendant.  After the statement was read, no changes were made and defendant agreed to sign it.  During the course of the statement defendant never told him that he was a Gangster Disciple and then became an Unknown vicelord and that he was not affiliated with any gang on March 5, 1996.  He never stated that two men approached him on March 5, 1996, one of whom was the victim and the other a masked individual.  He never stated that the victim threatened to kill him on that date or that the victim chased him around a parked car.  Furthermore, he never stated that when the victim fell to the ground, the gun dropped from his hands and the masked man picked it up and fired at him, defendant.  Defendant did state that there had been prior confrontations with Mr. Thurmond but could not remember the details of them.  During the statement defendant appeared to be calm.

The jury convicted defendant.

The court sentenced defendant to 36 years in the Illinois Department of Corrections with credit for 646 days.

The first issue raised on appeal is whether or not the court erred in failing to suppress defendant's pre-trial statements where there was evidence he invoked his fifth amendment right to counsel and did not make a valid waiver prior to giving his statements.  

In reviewing a trial court's determination on a motion to suppress, we are mindful of the limited parameters of our review.  
People v. Melock
, 149 Ill. 2d 423, 599 N.E.2d 941 (1992).  Absent a determination that the trial court's finding was manifestly erroneous, we will not disturb it.  
People v. Reynolds
, 94 Ill.2d 160, 165, 445 N.E.2d 766(1983).  It is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony.  
People v. Redd
, 135 Ill.2d 252, 289, 533 N.E.2d 316(1990).   

The fifth and fourteenth amendments to the United States Constitution guarantee an accused the right to have counsel present during custodial interrogation.  (
Edwards v. Arizona
, 451 U.S. 477, 482-87, 68 L. Ed. 2d 378, 382-88, 101 S.Ct. 1880, 1883-86.  An accused who is to be subject to custodial interrogation must first be warned of that right.  
Miranda v. Arizona
, 384 U.S. 436 at 474, 16 L.Ed.2d at 724, 86 S.Ct. at 1628.  

Once an accused has 
"expressed his desire to deal with the police only through counsel, (he) is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communition, exchanges, or conversation with the police".  (
Edwards
, 451 U.S. at 484-85, 68 L.Ed.2d at 386, 101 S.Ct. at 1185; see also 
Minnick v. Mississippi
, 498 U.S. 146, 112 L.Ed.2d 489, 11 s.Ct. 486; (1990); 
People v. Winsett
, 153 Ill.2d 335, 349-50, 606 N.E.2d 1186(1992).

The trial judge in this case found there was no credible evidence that defendant requested the presence of an attorney for police interrogations, which is supported by the evidence.  While defendant testified he told police officers that he had a lawyer and did not want to talk to them until his lawyer was present, and that he only signed a waiver because Detective Samuel assured him  the matter was "routine", this testimony was contradicted by the testimony of Detective Samuel and ASA Fioti, who questioned him.  Further, in his court-reported statement, defendant stated he understood that he had the right to have an attorney present but that he wished to proceed with his statement.  We are mindful of the fact that initially Detective Samuel testified that Attorney Schmarak informed him he represented defendant but later testified he did not tell him he was representing him.  However, the record is also clear that defendant was in custody for nine months without the attorney's knowledge, which means neither defendant nor his father, who allegedly retained Mr. Schmarak, contacted him in order to let him know that his "client" had been arrested.   It was up to the trial judge to resolve the conflict, not only in Detective Samuel's testimony but also between defendant's testimony, Barry Schmarak and that of Detective Samuel and the Assistant State's Attorney.   The trial judge observed all of this testimony, and he was entitled to disbelieve defendant's version of what transpired.  We cannot find that the trial judge's ruling, that the defendant did not invoke his right to the presence of counsel during questioning, was against the manifest weight of the evidence.  Defendant's fifth amendment right to counsel was thus not violated, and his statements were not rendered inadmissible on this ground.

Defendant admits that statements obtained in violation of a defendant's Miranda rights may be used to impeach defendant's trial testimony, which was what was done in this case, as long as the statements are voluntary.  
Harris v. New York
, 401 U.S. 222, 224-

26, 28 L.Ed,2d 1, 91 S.Ct. 643(1971); 
Oregon v. Hass
, 420 U.S. 714, 720-24, 43 L.Ed.2d 570, 95 S.Ct. 1215(1975).  However, defendant argues, the judge should have given a limiting instruction, and his failure to do so means the jury may be presumed to have considered the evidence generally and not solely for its proper purpose.  
People v. Camp
, 128 Ill.App.3d 223, 231, 470 N.E.2d 540 (1984).  We agree with the State that defendant has waived this issue by failing to object to the jury instruction or by tendering a different jury instruction,  
People v. Milestone
, 283 Ill.App.3d 682, 686, 671 N.E.2d 51 (1996), and will not consider it.

Defendant's next issue is the length of his sentence of 36 years, which he argues  is excessive in light of his youth, lack of criminal background, the circumstances of the shooting

and potential for rehabilitation.

At the sentencing, several people, including defendant's minister and family friends, testified to defendant's good character and how he was a victim of circumstances and that society would be better served if he were not incarcerated.  Defendant made a statement in allocution wherein he expressed his remorse over the shooting but that he did not do it intentionally, but out of fear for his life.

The trial judge stated he considered all of the circumstances of the case as well as the arguments of counsel.  He also stated that one of the sentencing provisions provides that a sentence of 36 years serves to deter others and that this case was "gangbanging at its finest."

It has long been established that the trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive.  
People v. Jones
, 168 Ill.2d 367, 659 N.E.2d 1306(1995).  The trial court is in a superior position to assess the credibility of the witnesses and to weight the evidence presented at the sentencing hearing.  
People v. LaPointe
, 88 Ill.2d 482, 492-93, 431 N.E.2d 344(1981).  A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age.  
People v. Perruquet
, 68 Ill.2d 149, 368 N.E.2d 882(1977).    Where the sentence chosen by the trial court is within the statutory range permissible for the pertinent criminal offense for which the defendant has been tried and charged, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed.  
People v. Jones
, 168 Ill. 2d at 374; 
People
 
v. Godinez
, 91 Ill.2d 47, 54-44, 434 N.E.2d 1121 (1982).

For a conviction of first degree murder the sentence is a term  for not less than 20 years and not more than 60 years.  730 ILCS 5/5-8-1 (a)(1)(a)(West 1999).  A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by written motion filed within 30 days following the imposition of the sentence.  730 ILCS 5/5-8-1 (c)(West 1999).

Defendant failed to file a written motion challenging his sentence, and therefore, we find the issue is waived.  Nonetheless, 36 years is well within the sentencing range, and based upon the evidence and the fact that the victim was shot in the back as he was running away from defendant, we do not find the trial court abused its discretion in the sentence it imposed.  

Lastly, both defendant and the State agree that in light of the Illinois Supreme Court's recent ruling in 
People v. Reedy
, 186 Ill.2d 1, 708 N.E.2d 1114 (1999), defendant should not be subject to the Truth-in-Sentencing law.    We hold defendant is entitled to day-for-day good conduct credit.  It is so ordered.

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

WOLFSON and HALL,JJ., concur.